# WILSON ET AL. *v.* LAYNE, DEPUTY UNITED STATES MARSHAL, ET AL.

No. 98–83.   Argued March 24, 1999—Decided May 24, 1999

REHNQUIST, C. J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Part III, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 618.

*Richard K. Willard* argued the cause for petitioners. With him on the briefs were *David H. Coburn, James S. Felt, Richard Seligman, Steven R. Shapiro, Arthur B. Spitzer,* and *Dwight H. Sullivan.*

*Lawrence P. Fletcher-Hill,* Assistant Attorney General of Maryland, argued the cause for the state respondents. With him on the brief were *J. Joseph Curran, Jr.,* Attorney General, *Carmen M. Shepard,* Deputy Attorney General, and *Andrew H. Baida* and *John B. Howard, Jr.,* Assistant Attorneys General. *Richard A. Cordray* filed a brief for the federal respondents.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

While executing an arrest warrant in a private home, police officers invited representatives of the media to accompany them. We hold that such a "media ride-along" does violate the Fourth Amendment, but that because the state

---

*A brief of *amici curiae* urging affirmance was filed for ABC, Inc., et al. by *Lee Levine, James E. Grossberg, Jay Ward Brown, Henry S. Hoberman, Richard M. Schmidt, Jr., Susanna M. Lowy, Harold W. Fuson, Jr., Barbara Wartelle Wall, Ralph E. Goldberg, Karlene W. Goller, Jerry S. Birenz, Slade R. Metcalf, Jack N. Goodman, David S. J. Brown, René P. Milam, George Freeman,* and *Jane E. Kirtley.*

of the law was not clearly established at the time the search in this case took place, the officers are entitled to the defense of qualified immunity.

I

In early 1992, the Attorney General of the United States approved "Operation Gunsmoke," a special national fugitive apprehension program in which United States Marshals worked with state and local police to apprehend dangerous criminals. The "Operation Gunsmoke" policy statement explained that the operation was to concentrate on "armed individuals wanted on federal and/or state and local warrants for serious drug and other violent felonies." App. 15. This effective program ultimately resulted in over 3,000 arrests in 40 metropolitan areas. Brief for Federal Respondents Layne et al. 2.

One of the dangerous fugitives identified as a target of "Operation Gunsmoke" was Dominic Wilson, the son of petitioners Charles and Geraldine Wilson. Dominic Wilson had violated his probation on previous felony charges of robbery, theft, and assault with intent to rob, and the police computer listed "caution indicators" that he was likely to be armed, to resist arrest, and to "assaul[t] police." App. 40. The computer also listed his address as 909 North StoneStreet Avenue in Rockville, Maryland. Unknown to the police, this was actually the home of petitioners, Dominic Wilson's parents. Thus, in April 1992, the Circuit Court for Montgomery County issued three arrest warrants for Dominic Wilson, one for each of his probation violations. The warrants were each addressed to "any duly authorized peace officer," and commanded such officers to arrest him and bring him "immediately" before the Circuit Court to answer an indictment as to his probation violation. The warrants made no mention of media presence or assistance.[1]

---

[1] The warrants were identical in all relevant respects. By way of example, one of them read as follows:

In the early morning hours of April 16, 1992, a Gunsmoke team of Deputy United States Marshals and Montgomery County Police officers assembled to execute the Dominic Wilson warrants. The team was accompanied by a reporter and a photographer from the Washington Post, who had been invited by the Marshals to accompany them on their mission as part of a Marshals Service ride-along policy.

At around 6:45 a.m., the officers, with media representatives in tow, entered the dwelling at 909 North StoneStreet Avenue in the Lincoln Park neighborhood of Rockville. Petitioners Charles and Geraldine Wilson were still in bed when they heard the officers enter the home. Petitioner Charles Wilson, dressed only in a pair of briefs, ran into the living room to investigate. Discovering at least five men in street clothes with guns in his living room, he angrily demanded that they state their business, and repeatedly cursed the officers. Believing him to be an angry Dominic Wilson, the officers quickly subdued him on the floor. Geraldine Wilson next entered the living room to investigate, wearing only a nightgown. She observed her husband being restrained by the armed officers.

When their protective sweep was completed, the officers learned that Dominic Wilson was not in the house, and they departed. During the time that the officers were in the home, the Washington Post photographer took numerous pictures. The print reporter was also apparently in the living room observing the confrontation between the police and

---

"The State of Maryland, to any duly authorized peace officer, greeting: you are hereby commanded to take Dominic Jerome Wilson if he/she shall be found in your bailiwick, and have him immediately before the Circuit Court for Montgomery County, now in session, at the Judicial Center, in Rockville, to answer an indictment, or information, or criminal appeals unto the State of Maryland, of and concerning a certain charge of Robbery [Violation of Probation] by him committed, as hath been presented, and so forth. Hereof fail not at your peril, and have you then and there this writ. Witness." App. 36–37.

Charles Wilson. At no time, however, were the reporters involved in the execution of the arrest warrant. Brief for Federal Respondents Layne et al. 4. The Washington Post never published its photographs of the incident.

Petitioners sued the law enforcement officials in their personal capacities for money damages under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971) (the U. S. Marshals Service respondents), and Rev. Stat. § 1979, 42 U. S. C. § 1983 (the Montgomery County Sheriff's Department respondents). They contended that the officers' actions in bringing members of the media to observe and record the attempted execution of the arrest warrant violated their Fourth Amendment rights. The District Court denied respondents' motion for summary judgment on the basis of qualified immunity.

On interlocutory appeal to the Court of Appeals, a divided panel reversed and held that respondents were entitled to qualified immunity. The case was twice reheard en banc, where a divided Court of Appeals again upheld the defense of qualified immunity. The Court of Appeals declined to decide whether the actions of the police violated the Fourth Amendment. It concluded instead that because no court had held (at the time of the search) that media presence during a police entry into a residence violated the Fourth Amendment, the right allegedly violated by respondents was not "clearly established" and thus qualified immunity was proper. 141 F. 3d 111 (CA4 1998). Five judges dissented, arguing that the officers' actions did violate the Fourth Amendment, and that the clearly established protections of the Fourth Amendment were violated in this case. *Id.*, at 119 (opinion of Murnaghan, J.)

Recognizing a split among the Circuits on this issue, we granted certiorari in this case and another raising the same question, *Hanlon* v. *Berger*, 525 U. S. 981 (1998), and now affirm the Court of Appeals, although by different reasoning.

## II

Petitioners sued the federal officials under *Bivens* and the state officials under § 1983. Both *Bivens* and § 1983 allow a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights. See § 1983; *Bivens, supra,* at 397. But government officials performing discretionary functions generally are granted a qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald,* 457 U. S. 800, 818 (1982).

Although this case involves suits under both § 1983 and *Bivens,* the qualified immunity analysis is identical under either cause of action. See, *e. g., Graham* v. *Connor,* 490 U. S. 386, 394, n. 9 (1989); *Malley* v. *Briggs,* 475 U. S. 335, 340, n. 2 (1986). A court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn* v. *Gabbert, ante,* at 290. This order of procedure is designed to "spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert* v. *Gilley,* 500 U. S. 226, 232 (1991). Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public. See *County of Sacramento* v. *Lewis,* 523 U. S. 833, 840–842, n. 5 (1998). We now turn to the Fourth Amendment question.

In 1604, an English court made the now-famous observation that "the house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose." *Semayne's Case,* 5 Co. Rep. 91a, 91b, 77

Eng. Rep. 194, 195 (K. B.).   In his Commentaries on the Laws of England, William Blackstone noted that

> "the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle, and will never suffer it to be violated with impunity: agreeing herein with the sentiments of antient Rome . . . .   For this reason no doors can in general be broken open to execute any civil process; though, in criminal causes, the public safety supersedes the private."   4 Commentaries 223 (1765–1769).

The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home: "The right of the people to be secure in their persons, *houses,* papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   U. S. Const., Amdt. 4 (emphasis added).   See also *United States* v. *United States Dist. Court for Eastern Dist. of Mich.,* 407 U. S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed").

Our decisions have applied these basic principles of the Fourth Amendment to situations, like the one in this case, in which police enter a home under the authority of an arrest warrant in order to take into custody the suspect named in the warrant.   In *Payton* v. *New York*, 445 U. S. 573, 602 (1980), we noted that although clear in its protection of the home, the common-law tradition at the time of the drafting of the Fourth Amendment was ambivalent on the question whether police could enter a home without a warrant.   We were ultimately persuaded that the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic" meant that absent a warrant or exigent circumstances, police could not

enter a home to make an arrest. *Id.*, at 601, 603–604. We decided that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.*, at 603.

Here, of course, the officers had such a warrant, and they were undoubtedly entitled to enter the Wilson home in order to execute the arrest warrant for Dominic Wilson. But it does not necessarily follow that they were entitled to bring a newspaper reporter and a photographer with them. In *Horton* v. *California,* 496 U. S. 128, 140 (1990), we held "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." While this does not mean that every police action while inside a home must be explicitly authorized by the text of the warrant, see *Michigan* v. *Summers,* 452 U. S. 692, 705 (1981) (Fourth Amendment allows temporary detainer of homeowner while police search the home pursuant to warrant), the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion, see *Arizona* v. *Hicks,* 480 U. S. 321, 325 (1987). See also *Maryland* v. *Garrison,* 480 U. S. 79, 87 (1987) ("[T]he purposes justifying a police search strictly limit the permissible extent of the search").

Certainly the presence of reporters inside the home was not related to the objectives of the authorized intrusion. Respondents concede that the reporters did not engage in the execution of the warrant, and did not assist the police in their task. The reporters therefore were not present for any reason related to the justification for police entry into the home—the apprehension of Dominic Wilson.

This is not a case in which the presence of the third parties directly aided in the execution of the warrant. Where the police enter a home under the authority of a warrant to

search for stolen property, the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition. See, e. g., *Entick* v. *Carrington*, 19 How. St. Tr. 1029, 1067 (K. B. 1765) (in search for stolen goods case, " '[t]he owner must swear that the goods are lodged in such a place. He must attend at the execution of the warrant to shew them to the officer, who must see that they answer the description") (quoted with approval in *Boyd* v. *United States*, 116 U. S. 616, 628 (1886)).

Respondents argue that the presence of the Washington Post reporters in the Wilsons' home nonetheless served a number of legitimate law enforcement purposes. They first assert that officers should be able to exercise reasonable discretion about when it would "further their law enforcement mission to permit members of the news media to accompany them in executing a warrant." Brief for Federal Respondents Layne et al. 15. But this claim ignores the importance of the right of residential privacy at the core of the Fourth Amendment. It may well be that media ride-alongs further the law enforcement objectives of the police in a general sense, but that is not the same as furthering the purposes of the search. Were such generalized "law enforcement objectives" themselves sufficient to trump the Fourth Amendment, the protections guaranteed by that Amendment's text would be significantly watered down.

Respondents next argue that the presence of third parties could serve the law enforcement purpose of publicizing the government's efforts to combat crime, and facilitate accurate reporting on law enforcement activities. There is certainly language in our opinions interpreting the First Amendment which points to the importance of "the press" in informing the general public about the administration of criminal justice. In *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 491–492 (1975), for example, we said "in a society in which each individual has but limited time and resources with which to

observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." See also *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 572–573 (1980). No one could gainsay the truth of these observations, or the importance of the First Amendment in protecting press freedom from abridgment by the government. But the Fourth Amendment also protects a very important right, and in the present case it is in terms of that right that the media ride-alongs must be judged.

Surely the possibility of good public relations for the police is simply not enough, standing alone, to justify the ride-along intrusion into a private home. And even the need for accurate reporting on police issues in general bears no direct relation to the constitutional justification for the police intrusion into a home in order to execute a felony arrest warrant.

Finally, respondents argue that the presence of third parties could serve in some situations to minimize police abuses and protect suspects, and also to protect the safety of the officers. While it might be reasonable for police officers to themselves videotape home entries as part of a "quality control" effort to ensure that the rights of homeowners are being respected, or even to preserve evidence, cf. *Ohio* v. *Robinette*, 519 U. S. 33, 35 (1996) (noting the use of a "mounted video camera" to record the details of a routine traffic stop), such a situation is significantly different from the media presence in this case. The Washington Post reporters in the Wilsons' home were working on a story for their own purposes. They were not present for the purpose of protecting the officers, much less the Wilsons. A private photographer was acting for private purposes, as evidenced in part by the fact that the newspaper and not the police retained the photographs. Thus, although the presence of third parties during the execution of a warrant may in some circumstances be constitutionally permissible, see *supra*, at 611–612, the presence of *these* third parties was not.

The reasons advanced by respondents, taken in their entirety, fall short of justifying the presence of media inside a home. We hold that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant.[2]

## III

Since the police action in this case violated petitioners' Fourth Amendment right, we now must decide whether this right was clearly established at the time of the search. See *Siegert*, 500 U. S., at 232–233. As noted above, Part II, *supra*, government officials performing discretionary functions generally are granted a qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U. S., at 818. What this means in practice is that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson* v. *Creighton*, 483 U. S. 635, 639 (1987) (citing *Harlow*, *supra*, at 819); see also *Graham* v. *Connor*, 490 U. S., at 397.

In *Anderson*, we explained that what "clearly established" means in this context depends largely "upon the level of generality at which the relevant 'legal rule' is to be identified." 483 U. S., at 639. "[C]learly established" for purposes of

---

[2] Even though such actions might violate the Fourth Amendment, if the police are lawfully present, the violation of the Fourth Amendment is the presence of the media and not the presence of the police in the home. We have no occasion here to decide whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives.

qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.,* at 640 (citations omitted); see also *United States* v. *Lanier,* 520 U. S. 259, 270 (1997).

It could plausibly be asserted that any violation of the Fourth Amendment is "clearly established," since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. Some variation of this theory of qualified immunity is urged upon us by petitioners, Brief for Petitioners 37, and seems to have been at the core of the dissenting opinion in the Court of Appeals, see 141 F. 3d, at 123. However, as we explained in *Anderson,* the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established. 483 U. S., at 641. In this case, the appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed. Cf. *ibid.*

We hold that it was not unreasonable for a police officer in April 1992 to have believed that bringing media observers along during the execution of an arrest warrant (even in a home) was lawful. First, the constitutional question presented by this case is by no means open and shut. The Fourth Amendment protects the rights of homeowners from entry without a warrant, but there was a warrant here. The question is whether the invitation to the media exceeded the scope of the search authorized by the warrant. Accurate media coverage of police activities serves an important public purpose, and it is not obvious from the general principles

616

of the Fourth Amendment that the conduct of the officers in this case violated the Amendment.

Second, although media ride-alongs of one sort or another had apparently become a common police practice,[3] in 1992 there were no judicial opinions holding that this practice became unlawful when it entered a home. The only published decision directly on point was a state intermediate court decision which, though it did not engage in an extensive Fourth Amendment analysis, nonetheless held that such conduct was not unreasonable. *Prahl* v. *Brosamle*, 98 Wis. 2d 130, 154–155, 295 N. W. 2d 768, 782 (App. 1980). From the federal courts, the parties have only identified two unpublished District Court decisions dealing with media entry into homes, each of which upheld the search on unorthodox non-Fourth Amendment right to privacy theories. *Moncrief* v. *Hanton*, 10 Media L. Rptr. 1620 (ND Ohio 1984); *Higbee* v. *Times-Advocate*, 5 Media L. Rptr. 2372 (SD Cal. 1980). These cases, of course, cannot "clearly establish" that media entry into homes during a police ride-along violates the Fourth Amendment.

At a slightly higher level of generality, petitioners point to *Bills* v. *Aseltine*, 958 F. 2d 697 (CA6 1992), in which the Court of Appeals for the Sixth Circuit held that there were material issues of fact precluding summary judgment on the question whether police exceeded the scope of a search warrant by allowing a private security guard to participate in the search to identify stolen property other than that described in the warrant. *Id.*, at 709. *Bills*, which was decided a mere five weeks before the events of this case, did anticipate today's holding that police may not bring along third parties during an entry into a private home pursuant

---

[3] See, *e. g., Florida Publishing Co.* v. *Fletcher*, 340 So. 2d 914, 919 (1976) (it " 'is a widespread practice of long-standing' " for media to accompany officers into homes), cert. denied, 431 U. S. 930 (1977); Zoglin, Live on the Vice Beat, Time, Dec. 22, 1986, p. 60 (noting "the increasingly common practice of letting TV crews tag along on drug raids").

to a warrant for purposes unrelated to those justifying the warrant. *Id.*, at 706. However, we cannot say that even in light of *Bills*, the law on third-party entry into homes was clearly established in April 1992. Petitioners have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident that clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.

Finally, important to our conclusion was the reliance by the United States marshals in this case on a Marshals Service ride-along policy that explicitly contemplated that media who engaged in ride-alongs might enter private homes with their cameras as part of fugitive apprehension arrests.[4] The Montgomery County Sheriff's Department also at this time had a ride-along program that did not expressly prohibit media entry into private homes. Deposition of Sheriff Raymond M. Kight, in No. PJM–94–1718, p. 8. Such a policy, of course, could not make reasonable a belief that was contrary to a decided body of case law. But here the state of the law as to third parties accompanying police on home entries was at best undeveloped, and it was not unreasonable for law enforcement officers to look and rely on their formal ride-along policies.

Given such an undeveloped state of the law, the officers in this case cannot have been "expected to predict the future course of constitutional law." *Procunier* v. *Navarette*, 434

---

[4] A booklet distributed to marshals recommended that "fugitive apprehension cases . . . normally offer the best possibilities for ride-alongs." App. 4–5. In its discussion of the best way to make ride-alongs useful to the media and portray the Marshals Service in a favorable light, the booklet noted that reporters were likely to want to be able to shoot "good action footage, not just a mop-up scene." It advised agents that "[i]f the arrest is planned to take place inside a house or building, agree ahead of time on when the camera can enter and who will give the signal." *Id.*, at 7.

U. S. 555, 562 (1978). See also *Wood* v. *Strickland,* 420 U. S. 308, 321 (1975); *Pierson* v. *Ray,* 386 U. S. 547, 557 (1967). Between the time of the events of this case and today's decision, a split among the Federal Circuits in fact developed on the question whether media ride-alongs that enter homes subject the police to money damages. See 141 F. 3d, at 118–119; *Ayeni* v. *Mottola,* 35 F. 3d 680 (CA2 1994), cert. denied, 514 U. S. 1062 (1995); *Parker* v. *Boyer,* 93 F. 3d 445 (CA8 1996), cert. denied, 519 U. S. 1148 (1997); *Berger* v. *Hanlon,* 129 F. 3d 505 (CA9 1997), cert. granted, 525 U. S. 981 (1998). If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

Like every other federal appellate judge who has addressed the question, I share the Court's opinion that it violates the Fourth Amendment for police to bring members of the media or other third parties into a private dwelling during the execution of a warrant unless the homeowner has consented or the presence of the third parties is in aid of the execution of the warrant. I therefore join Parts I and II of the Court's opinion.

In my view, however, the homeowner's right to protection against this type of trespass was clearly established long before April 16, 1992. My sincere respect for the competence of the typical member of the law enforcement profession precludes my assent to the suggestion that "a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful." *Ante,* at 615. I therefore disagree with the Court's

resolution of the conflict in the Circuits on the qualified immunity issue.[1]   The clarity of the constitutional rule, a federal statute (18 U. S. C. § 3105), common-law decisions, and the testimony of the senior law enforcement officer all support my position that it has long been clearly established that officers may not bring third parties into private homes to witness the execution of a warrant.  By contrast, the Court's opposing view finds support in the following sources: its bare assertion that the constitutional question "is by no means open and shut," *ante*, at 615; three judicial opinions that did not directly address the constitutional question, *ante*, at 616; and a public relations booklet prepared by someone in the United States Marshals Service that never mentions allowing representatives of the media to enter private property without the owner's consent, *ante*, at 617.

I

In its decision today the Court has not announced a new rule of constitutional law.  Rather, it has refused to recognize an entirely unprecedented request for an exception to a well-established principle.  Police action in the execution of a warrant must be strictly limited to the objectives of the authorized intrusion.  That principle, like the broader protection provided by the Fourth Amendment itself, represents the confluence of two important sources: our English forefathers' traditional respect for the sanctity of the private

---

[1] It is important to emphasize that there is no split in Circuit authority on the merits of the constitutional issue.  Nor, as I explain *infra*, at 622–624, do I believe that any District Court had reached a conclusion at odds with the Court's Fourth Amendment holding.  Any conflict was limited to the qualified immunity issue.  Three Circuits rejected the defense whereas the Fourth and the Eighth accepted it.  See *Ayeni* v. *Mottola*, 35 F. 3d 680, 686 (CA2 1994); *Bills* v. *Aseltine*, 958 F. 2d 697 (CA6 1992); *Berger* v. *Hanlon*, 129 F. 3d 505 (CA9 1997); 141 F. 3d 111 (CA4 1998) (en banc); *Parker* v. *Boyer*, 93 F. 3d 445 (CA8 1996).

home and the American colonists' hatred of the general warrant.

The contours of the rule are fairly described by the Court, *ante*, at 609–611 of its opinion, and in the cases that it cites on those pages. All of those cases were decided before 1992. None of those cases—nor, indeed, any other of which I am aware—identified any exception to the rule of law that the Court repeats today. In fact, the Court's opinion fails to identify a colorable rationale for any such exception. Respondents' position on the merits consisted entirely of their unpersuasive factual submission that the presence of representatives of the news media served various legitimate—albeit nebulous—law enforcement purposes. The Court's cogent rejection of those *post hoc* rationalizations cannot be characterized as the announcement of a new rule of law.

During my service on the Court, I have heard lawyers argue scores of cases raising Fourth Amendment issues. Generally speaking, the Members of the Court have been sensitive to the needs of the law enforcement community. In virtually all of them at least one Justice thought that the police conduct was reasonable. In fact, in only a handful did the Court unanimously find a Fourth Amendment violation. That the Court today speaks with a single voice on the merits of the constitutional question is unusual and certainly lends support to the notion that the question is indeed "open and shut." *Ante*, at 615.

But the more important basis for my opinion is that it should have been perfectly obvious to the officers that their "invitation to the media exceeded the scope of the search authorized by the warrant." *Ibid.* Despite reaffirming that clear rule, the Court nonetheless finds that the mere presence of a warrant rendered the officers' conduct reasonable. The Court fails to cite a single case that even arguably supports the proposition that using official power to enable news photographers and reporters to enter a private home for purposes unrelated to the execution of a warrant could

be regarded as a "reasonable" invasion of either property or privacy.

## II

The absence of judicial opinions expressly holding that police violate the Fourth Amendment if they bring media representatives into private homes provides scant support for the conclusion that in 1992 a competent officer could reasonably believe that it would be lawful to do so. Prior to our decision in *United States* v. *Lanier*, 520 U. S. 259 (1997), no judicial opinion specifically held that it was unconstitutional for a state judge to use his official power to extort sexual favors from a potential litigant. Yet, we unanimously concluded that the defendant had fair warning that he was violating his victim's constitutional rights. *Id.*, at 271 ("The easiest cases don't even arise" (citations and internal quotation marks omitted)).

Nor am I persuaded that the absence of rulings on the precise Fourth Amendment issue presented in this case can plausibly be explained by the assumption that the police practice was common. I assume that the practice of allowing media personnel to "ride along" with police officers was common, but that does not mean that the officers routinely allowed the media to enter homes without the consent of the owners. As the Florida Supreme Court noted in *Florida Publishing Co.* v. *Fletcher*, 340 So. 2d 914, 918 (1976), there has long been a widespread practice for firefighters to allow photographers to enter disaster areas to take pictures, for example, of the interior of buildings severely damaged by fire. But its conclusion that such media personnel were not trespassers rested on a doctrine of implied consent[2]—a the-

---

[2] The Florida Supreme Court held:

"The trial court properly determined from the record before it that there was no genuine issue of material fact insofar as the entry into respondent's home by petitioner's employees became lawful and non-actionable pursu-

ory wholly inapplicable to forcible entries in connection with the execution of a warrant.[3]

In addition to this case, the Court points to three lower court opinions—none of which addresses the Fourth Amendment—as the ostensible basis for a reasonable officer's belief that the rule in *Semayne's Case*[4] was ripe for reevaluation.[5] See *ante*, at 616. Two of the cases were decided in 1980 and the third in 1984. In view of the clear restatement of the rule in the later opinions of this Court, cited *ante*, at 611, those three earlier decisions could not possibly provide a

---

ant to the doctrine of common custom, usage, and practice and since it had been shown that it was common usage, custom and practice for news media to enter private premises and homes *under the circumstances present here.*

.        .        .        .        .

"'The fire was a disaster of great public interest . . . . [I]t has been a longstanding custom and practice throughout the country for representatives of the news media to enter upon private property where disaster of great public interest has occurred.'" 340 So. 2d, at 917–918.

The Court's reference to this case, *ante*, at 616, n. 3, misleadingly suggests that the "widespread practice" referred to in the Florida court's opinion was police practice; it was not.

[3] Indeed, the Wisconsin state-court decision, cited by the Court as contrary authority, took pains to distinguish this case:

"We will not imply a consent as a matter of law. It is of course well known that news representatives want to enter a private building after or even during a newsworthy event within the building. That knowledge is no basis for an implied consent by the possessor of the building to the entry. . . . We conclude that custom and usage have not been shown in fact or law to confer an implied consent upon news representatives to enter a building under the circumstances presented by this case." *Prahl* v. *Brosamle*, 98 Wis. 2d 130, 149–150, 295 N. W. 2d 768, 780 (App. 1980).

[4] 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1604).

[5] As the Court notes, the only Federal Court of Appeals authority on the subject, *Bills* v. *Aseltine*, 958 F. 2d 697 (CA6 1992), "anticipate[d] today's holding that police may not bring along third parties during an entry into a private home pursuant to a warrant for purposes unrelated to those justifying the warrant." *Ante*, at 616–617.

basis for a claim by the police that they reasonably relied on judicial recognition of an exception to the basic rule that the purposes of the police intrusion strictly limit its scope.

That the two federal decisions were not officially reported makes such theoretical reliance especially anomalous.[6] Moreover, as the Court acknowledges, the claim rejected in each of those cases was predicated on the media's alleged violation of the plaintiffs' "unorthodox non-Fourth Amendment right to privacy theories," *ante*, at 616, rather than a claim that the officers violated the Fourth Amendment by allowing the press to observe the execution of the warrant. *Moncrief* v. *Hanton*, 10 Media L. Rptr. 1620 (ND Ohio 1984); *Higbee* v. *Times-Advocate*, 5 Media L. Rptr. 2372 (SD Cal. 1980). As for the other case, *Prahl* v. *Brosamle*, 98 Wis. 2d 130, 295 N. W. 2d 768 (App. 1980)—cited by the Court, *ante*, at 616, for the proposition that the officer's conduct was "not unreasonable"—it actually held that the defendants' motion to dismiss should have been denied because the allegations supported the conclusion that the officer committed a trespass when he allowed a third party to enter the plaintiff's property.[7] Since that conclusion was fully consistent with a

---

[6] In the Fourth Circuit, unreported opinions may not be considered in the course of determining qualified immunity. *Hogan* v. *Carter*, 85 F. 3d 1113, 1118 (1996).

[7] *Prahl* v. *Brosamle*, 98 Wis. 2d, at 154–155, 295 N. W. 2d, at 782 ("A new trial must be had with respect to the plaintiffs' claims for trespass against Lieutenant Kuenning and Dane Country .... Lieutenant Kuenning had no authority to extend a consent to [the press] to enter the land of another. Although entry by Lieutenant Kuenning was privileged, he committed a trespass by participating in the trespass by [the press]").

The Court is correct that the Wisconsin Court of Appeals upheld dismissal of the plaintiff's 42 U. S. C. § 1983 claim *against the newscaster* because he was not acting under color of state law. As the basis for rejecting the § 1983 action "for invasion of privacy based on disclosure of the incident," the court further held that "[w]e are unwilling to accept the proposition that the filming and television broadcast of a reasonable search and seizure, without more, result in unreasonableness." 98 Wis. 2d, at

number of common-law cases holding that similar conduct constituted a trespass,[8] it surely does not provide any support for an officer's assumption that a similar trespass would be lawful.

Far better evidence of an officer's reasonable understanding of the relevant law is provided by the testimony of the Sheriff of Montgomery County, the commanding officer of three of the respondents: "'We would never let a civilian into a home. . . . That's just not allowed.'" Brief for Petitioners 41.

### III

The most disturbing aspect of the Court's ruling on the qualified immunity issue is its reliance on a document discussing "ride-alongs" apparently prepared by an employee in the public relations office of the United States Marshals Service. The text of the document, portions of which are set out in an appendix, makes it quite clear that its author was not a lawyer, but rather a person concerned with developing the proper public image of the Service, with a special interest in creating a favorable impression with the Congress. Although the document occupies 14 pages in the joint

---

138, 295 N. W. 2d, at 774. Important to its conclusion was its observation that, unlike the unnecessary male participation in body searches of schoolgirls in *Doe* v. *Duter*, 407 F. Supp. 922 (WD Wis. 1976), "[n]either the search of Dr. Prahl and his premises nor the film or its broadcast has been shown to include intimate, offensive or vulgar aspects." 98 Wis. 2d, at 138, 295 N. W. 2d, at 774. The reporter in question was stationed in the entryway of the building and was able to film into the plaintiff's office during the police interview.

[8] See, *e. g.*, *Daingerfield* v. *Thompson*, 74 Va. 136, 151 (1880) ("There seems, indeed, to be no principle of law better settled, and for which numerous authorities may be cited if necessary, than this: that all persons who wrongfully contribute in any manner to the commission of a trespass, are responsible as principals, and each one is liable to the extent of the injury done"); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 13, p. 72 (5th ed. 1984).

appendix and suggests handing out free Marshals Service T-shirts and caps to "grease the skids," it contains no discussion of the conditions which must be satisfied before a newsperson may be authorized to enter private property during the execution of a warrant. App. 12. There are guidelines about how officers should act and speak in front of the camera, and the document does indicate that "the camera" should not enter a private home until a "signal" is given. *Id.*, at 7. It does not, however, purport to give any guidance to the marshals regarding when such a signal should be given, whether it should ever be given without the consent of the homeowner, or indeed on how to carry out any part of their law enforcement mission. The notion that any member of that well-trained cadre of professionals would rely on such a document for guidance in the performance of dangerous law enforcement assignments is too farfetched to merit serious consideration.

\*    \*    \*

The defense of qualified immunity exists to protect reasonable officers from personal liability for official actions later found to be in violation of constitutional rights that were not clearly established. The conduct in this case, as the Court itself reminds us, contravened the Fourth Amendment's core protection of the home. In shielding this conduct as if it implicated only the unsettled margins of our jurisprudence, the Court today authorizes one free violation of the well-established rule it reaffirms.

I respectfully dissent.

### APPENDIX TO OPINION OF STEVENS, J.

### "MEDIA RIDE-ALONGS

"The U. S. Marshals Service, like all federal agencies, ultimately serves the needs and interests of the American public

when it accomplishes its designated duties. Keeping the public adequately informed of what the Service does can be viewed as a duty in its own right, and we depend on the news media to accomplish that.

"Media 'ride-alongs' are one effective method to promote an accurate picture of Deputy Marshals at work. Ride-alongs, as the name implies, are simply opportunities for reporters and camera crews to go along with Deputies on operational missions so they can see, and record, what actually happens. The result is usually a very graphic and dynamic look at the operational activities of the Marshals Service, which is subsequently aired on TV or printed in a newspaper, magazine, or book.

"However, successful ride-alongs don't just 'happen' in a spontaneous fashion. They require careful planning and attention to detail to ensure that all goes smoothly and that the media receive an accurate picture of how the Marshals Service operates. This booklet describes considerations that are important in nearly every ride-along." App. 4.

"Establish Ground Rules

"Another good idea—actually, it's an essential one—is to establish ground rules at the start and convey them to the reporter and camera person. Address such things as what can be covered with cameras and when, any privacy restrictions that may be encountered, and interview guidelines.

"Emphasize the need for safety considerations and explain any dangers that might be involved. Make the ground rules realistic but balanced—remember, the media will want good action footage, not just a mop-up scene. If the arrest is planned to take place inside a house or building, agree ahead of time on when the camera can enter and who will give the signal." *Id.*, at 7.

"The very best planning won't result in a good ride-along if the Marshals Service personnel involved do not do their part. It's a case of actions speaking as loudly as words, and both

are important in getting the best media exposure possible." *Id.*, at 9.

" 'Waving the Flag'

"One action of special consequence is 'waving the flag' of the Marshals Service. This is accomplished when Deputies can easily be recognized as USMS Deputies because they are wearing raid jackets, prominently displaying their badges, or exhibiting other easily identifiable marks of the Service. We want the public to know who you are and what kind of job you do. That is one of the goals of the ride-along. So having Deputy Marshals easily identified as such on camera is not just a whim—it's important to the overall success of the ride-along.

"Of course, how the Deputies act and what they say is also crucial. During the ride-along virtually any statement made by Deputies just might end up as a quote, attributed to the person who made it. Sometimes that could prove embarrassing. A Deputy must try to visualize what his or her words will look like in a newspaper or sound like on TV. Being pleasant and professional at all times is key, and that includes not being drawn into statements of personal opinion or inappropriate comments. Using common sense is the rule." *Id.*, at 9–10.

"You also need to find out when the coverage will air or end up in print. Ask the reporter if he or she can keep you informed on that matter. You might 'grease the skids' for this by offering the reporter, camera person, or other media representatives involved a memento of the Marshals Service. Marshals Service caps, mugs, T-shirts, and the like can help establish a rapport with a reporter that can benefit you in the future." *Id.*, at 12.

"Getting to the Final Product

"Naturally, it's important to see the final product of the ride-along when it airs on TV or appears in the newspaper. You

should arrange to videotape any TV news coverage or clip the resulting newspaper stories and send a copy of the videotape or news clipping to the Office of Congressional and Public Affairs." *Id.*, at 13.