Andra THOMPSON, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–0405–CR–286.

Court of Appeals of Indiana.

April 7, 2005.

Michael G. Moore, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Andra Thompson appeals his conviction for Possession of Cocaine, as a Class C felony, following a bench trial, and presents a single issue for review: whether the trial court abused its discretion when it admitted into evidence cocaine officers recovered from between Thompson's buttocks during a strip search incident to his arrest, which was filmed by a civilian camerawoman.

We reverse and remand.

### FACTS AND PROCEDURAL HISTORY

On June 10, 2003, Indianapolis Police Officers Pamela Lee and David Gard conducted an undercover drug investigation

from a motel room on the east side of Indianapolis. Officer Gard had information that a man named "Goldie," who was later identified as Thompson, was dealing cocaine in the area. Transcript at 9. Officer Lee posed as a prostitute and crack addict and made several attempts to telephone Thompson in search of cocaine. Eventually, Officer Lee left a call-back number on Thompson's pager, and Thompson returned her call. Officer Lee told him that she wanted $100 worth of cocaine and that, if he brought more, she would "make it worth his while." *Id.* at 11. Thompson then stated that he was "on his way." *Id.*

Later, there was a knock on the motel door, and Officer Lee looked through the peephole and asked who was there. Thompson replied, "It's Goldie." *Id.* at 12. At that point, Officer Lee opened the door, and other officers "grabbed" Thompson. *Id.* at 13. Officer Gard placed Thompson under arrest for attempting to deal cocaine.

Officer Gard then took Thompson into the bathroom to search him. Officer Gard pulled down Thomspon's pants and ordered him to bend over. The officer discovered a package of cocaine in between Thompson's buttocks.[1] Officer Gard had to wait for Officer Lee to bring him a pair of rubber gloves so that he could remove the package of cocaine. Officers later determined that the cocaine weighed more than three grams.

Throughout these events, a civilian camerawoman from the Oxygen Network was inside the motel room filming for a show entitled "Women and the Badge." *Id.* at 41. The camerawoman had no affiliation with law enforcement and did not aid in the arrest or search. Rather, the camerawoman filmed Thompson's arrest and portions of the search. In particular, the camerawoman filmed Thompson with his buttocks exposed, bent over in the motel bathroom while Officer Gard awaited the rubber gloves. At one point, the camerawoman zoomed in on the cocaine located between his buttocks.

The State charged Thompson with Class C felony possession of cocaine. Thompson moved to suppress the cocaine recovered during the search, and the trial court denied the motion. At his bench trial, Thompson renewed his objection to the admission of the cocaine, and the court overruled that objection. The videotape of Thompson's arrest and search that the camerawoman filmed was admitted into evidence at trial. The court found Thompson guilty as charged, entered judgment of conviction, and sentenced him to six years executed. Thompson now appeals.

## DISCUSSION AND DECISION

### Standard of Review

Although Thompson originally challenged the admission of the cocaine through a motion to suppress, he appeals following a completed trial and challenges the admission of such evidence at trial. "Thus, the issue is ... appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial." *Washington v. State,* 784 N.E.2d 584, 587 (Ind.Ct.App.2003). We have indicated that our standard of review of rulings on the admissibility of evidence is

1. To be clear, Officer Gard testified that he recovered the package of cocaine from Thompson's "buttocks." Transcript at 34. The officer also confirmed that during the search he "spread [Thompson's] buttocks to look for cocaine." *Id.* at 42. Our review of the videotape of Thompson's arrest and search confirm that the cocaine was located between his buttocks. Thus, Thompson's references in his brief to a search of his "anus" and his "anal cavity" are not supported by the record. *See* Brief of Appellant at 3, 8.

essentially the same whether the challenge is made by a pre-trial motion to suppress or by trial objection. *Ackerman v. State,* 774 N.E.2d 970, 974–75 (Ind.Ct.App.2002), *trans. denied.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Overstreet v. State,* 724 N.E.2d 661, 663 (Ind.Ct.App.2000), *trans. denied.* However, we must also consider the uncontested evidence favorable to the defendant. *See id.*

### Reasonableness of the Search

■ The lawfulness of a strip search depends on whether the circumstances reasonably justify such an intrusive invasion of privacy. *United States v. Cofield,* 391 F.3d 334, 336 (1st Cir.2004) (citing *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). As the United States Supreme Court explained in *Bell,* 441 U.S. at 559, 99 S.Ct. 1861, when it addressed the reasonableness of strip searches of pre-trial detainees:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Further, our supreme court explained in *Edwards v. State,* 759 N.E.2d 626, 629 (Ind.2001):

> The United States Supreme Court has held that once a lawful arrest has been made, authorities may conduct a "full search" of the arrestee for weapons or concealed evidence. No additional probable cause for the search is required, and the search incident to arrest may "'involve a relatively extensive explora-

tion of the person.'" Nonetheless, such a search would be unreasonable, and therefore a violation of the Fourth Amendment standard, if it were "extreme or patently abusive."

(Citations omitted). In *Edwards,* the court held that routine, warrantless strip searches of misdemeanor arrestees, even when incident to lawful arrests, are unreasonable under both Article I, Section 11 of the Indiana Constitution and the Fourth Amendment. *Id.* In so holding, the court explained that there may be misdemeanor charges for which a body search is appropriate because of the reasonable likelihood of discovery of evidence, but that the crime the defendant in that case was charged with, namely, false informing, is not such a crime. *Id.*

This court has also addressed whether a strip search was reasonable under the Fourth Amendment. In *Frye v. State,* 757 N.E.2d 684, 688–89 (Ind.Ct.App.2001), *trans. denied, cert. denied,* we concluded that an officer who conducted a strip search on a defendant who was suspected of having engaged in illegal drug activity was reasonable under the Fourth Amendment. Specifically, in *Frye,* officers were observing several houses that they suspected were involved in drug activity. *Id.* at 687. After observing what appeared to be multiple drug transactions in front of one house, the officers executed a traffic stop of an individual who had visited the home. That person admitted that he had purchased cocaine from a person in the home and identified Frye as the person who had sold it to him. The officers returned to the home and saw Frye standing in the front yard. As the officers approached and identified themselves, Frye took off running toward the house. One of the officers ordered Frye to stop, and he refused. Officers followed Frye inside the home, where they observed marijuana,

pipes, and other drug paraphernalia. When the officers eventually apprehended Frye, they arrested him for fleeing a police officer. The officers then conducted a strip search of Frye and found a baggie of cocaine in between his buttocks. But as one officer waited for someone to bring him rubber gloves so that he could retrieve the baggie, Frye grabbed the cocaine and placed it inside his mouth. Following a struggle, an officer retrieved the cocaine. Frye was subsequently charged and convicted of possession of cocaine, among other offenses. *Id.* at 687–88.

In concluding that the strip search of Frye was reasonable, we determined in part that Frye's arrest alone did not justify the strip search because "there must be a sense of proportionality between the offense for which the individual is arrested and the scope of the search." *Id.* at 690. And because the officers arrested Frye for fleeing a police officer, the arrest by itself would not justify a strip search. But we also determined that additional facts were present that rendered the strip search permissible, namely, the officers' discovery of illegal drugs and drug paraphernalia lying in plain view around the house into which Frye fled. That evidence, along with the circumstances that served as the basis for the investigative stop in the first place, provided the officers with reasonable suspicion that Frye was in possession of contraband. Thus, we concluded that a more expansive search commensurate with the nature of that reasonable suspicion was appropriate. *Id.*

■ Here, the officers arrested Thompson for attempting to deal cocaine, which is a felony. Once Thompson was placed under arrest, the officers were authorized to search him incident to his arrest. *See Edwards*, 759 N.E.2d at 629. In addition, it was more than reasonable for the officers to believe that Thompson had cocaine

somewhere on his person because he had told Officer Lee that he was on his way to the motel with the crack cocaine she had requested. Both of those circumstances support a conclusion that the strip search of Thompson was reasonable. But those are not the only circumstances relevant to our determination. Indeed, Thompson asserts that the search was unreasonable because a civilian camerawoman with no affiliation with law enforcement was present during and filmed the strip search. We must agree.

Initially, Thompson relies heavily on *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), which involved a civil action in which homeowners Charles and Geraldine Wilson sued several Deputy United States Marshals and other law enforcement officials ("the officers") for an alleged Fourth Amendment violation during the officers' execution of an arrest warrant at their home. Pursuant to a national fugitive apprehension program called "Operation Gunsmoke," the marshals had obtained multiple arrest warrants for the Wilsons' son, Dominic, who was wanted by law enforcement officials for several felony probation violations. *See id.* at 606, 119 S.Ct. 1692. Although the warrants did not mention that media would be present, a reporter and a photographer from the Washington Post accompanied the officers when they executed the warrants. *Id.* at 607, 119 S.Ct. 1692. The Court in *Wilson* explained the facts relevant to the officers' execution of the warrants as follows:

> At around 6:45 a.m., the officers, with media representatives in tow, entered the dwelling at 909 North Stone Street Avenue in the Lincoln Park neighborhood of Rockville. Petitioners Charles and Geraldine Wilson were still in bed when they heard the officers enter the home. Petitioner Charles Wilson,

dressed only in a pair of briefs, ran into the living room to investigate. Discovering at least five men in street clothes with guns in his living room, he angrily demanded that they state their business, and repeatedly cursed the officers. Believing him to be an angry Dominic Wilson, the officers quickly subdued him on the floor. Geraldine Wilson next entered the living room to investigate, wearing only a nightgown. She observed her husband being restrained by the armed officers.

When their protective sweep was completed, the officers learned that Dominic Wilson was not in the house, and they departed. During the time that the officers were in the home, the Washington Post photographer took numerous pictures. The print reporter was also apparently in the living room observing the confrontation between the police and Charles Wilson. At no time, however, were the reporters involved in the execution of the arrest warrant[s].

*Id.* at 607–08, 119 S.Ct. 1692. Based on those facts, the Supreme Court held "that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id.* at 614, 119 S.Ct. 1692.

Thompson also directs us to *United States v. Hendrixson,* 234 F.3d 494 (11th Cir.2000), *cert. denied.* In that case, the United States Court of Appeals for the Eleventh Circuit applied *Wilson* and held that the Fourth Amendment rights of one of three co-defendants, Mable Stephens, were violated when a television reporter accompanied police officers into her home

to execute a search warrant. 234 F.3d at 496. The court concluded that despite the Fourth Amendment violation, however, suppression of the evidence found during the search was not required under the federal exclusionary rule established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), because the officers, not the media representative, discovered the contraband. *See id.* at 496–97.[2]

We agree with the State that *Wilson* and *Hendrixson* are distinguishable because those cases involved media representatives who accompanied police officers into a private residence to execute a warrant. Here, the site of Thompson's arrest and search was a motel room, not his private residence. And Thompson makes no assertion that he had any privacy interest in the motel room.

Even though *Wilson* and *Hendrixson* are distinguishable on their facts and, thus, do not control the outcome here, we must nevertheless consider all of the circumstances when determining whether the strip search of Thompson was reasonable. *See Bell,* 441 U.S. at 559, 99 S.Ct. 1861 (stating in determining reasonableness of search, courts must consider scope of intrusion, manner of search, justification for search, and place conducted). The circumstances of this case include that a camerawoman with no affiliation with law enforcement was present during the search and that she filmed portions of the search. Indeed, our review of the videotape reveals that after Officer Gard had handcuffed Thompson and taken him into the motel bathroom, Officer Lee told the camerawoman, "You don't want to film that." Officer Lee then explained on camera that

2. The Court in *Wilson* did not address "whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives." 526 U.S. at 614 n. 2, 119 S.Ct. 1692.

the other officers would be looking for "the crack that they [drug dealers] usually keep in the crack." Thereafter, when Officer Lee went to retrieve gloves, the camerawoman stood at the threshold of the bathroom door and filmed Thompson, who was bent over with his pants pulled down and his buttocks exposed. Officer Gard was standing next to Thompson holding him down. Then, the camerawoman zoomed in on Thompson's bare buttocks, which revealed a white substance between his buttocks. The camerawoman zoomed back, and when Officer Lee arrived, officers stood in front of the camera as Officer Gard recovered the cocaine.

In determining that under the totality of the circumstances the search in this case was unreasonable, we find *United States v. Williams*, 209 F.3d 940 (7th Cir.2000), to be instructive. In that case, following a routine traffic stop of the defendant, officers asked for permission to search the vehicle. The defendant refused to consent to a search of his car, but the officers asked him and his passenger to exit the car because they "acted nervous and began fidgeting." *Id.* at 941. Once outside the car, the defendant consented to a pat down search, during which one of the officers felt a hard object between the defendant's buttocks. As the officer placed a rubber glove on his hand, the defendant fled. The officers chased and apprehended him. One officer then reached into the back of the defendant's pants, under his undershorts, and removed a plastic bag from the buttocks area which contained three rocks of crack cocaine. The defendant moved to suppress the cocaine, and the district court denied his motion. On appeal, the Seventh Circuit evaluated the reasonableness of the search incident to arrest and noted that the defendant "was never disrobed or exposed to the public" and that "[t]he search occurred at night, away from traffic and neither officer saw anyone in the vicinity."

*Id.* at 944. The court held that under those circumstances, the search was reasonable.

Similarly, in *Cofield*, 391 F.3d at 336, undercover officers conducted a strip search of a defendant incident to his arrest for drug and other offenses. After the officers conducted a pat down search on the street which revealed a bag of heroin, the officers decided to transport the defendant to a nearby precinct. En route, the officers noticed that the defendant was acting nervous. The defendant also asked whether the officers "would ... be mad" if he ran. *Id.* As a result, officers decided to conduct a strip search at the precinct. The search was conducted in a hallway near the booking desk, and there were no other people under arrest there at that time. The police had the defendant face the wall and drop his shorts and underwear. The officers found a gun hidden inside the defendant's underwear. The defendant moved to suppress the evidence recovered during the strip search, and the district court denied his motion. On appeal, the First Circuit affirmed the district court and, regarding the strip search, stated in relevant part:

> [T]he strip search was conducted in a professional manner with no more intrusion than necessary to accomplish the proper law enforcement purpose. The officers did not require [the defendant] to assume humiliating poses, expose himself in an unnecessarily public place or to members of the opposite sex, remain exposed for unreasonable durations, or endure degradation or ridicule. Nor was there any suggestion of any abusive or unprofessional motivation on the part of the officers.

*Id.* at 337.

The strip search of Thompson differed from the strip searches in *Williams* and *Cofield.* Thompson was required to bend

over with his bare buttocks exposed and raised in the air, while the officers allowed the camerawoman to observe and film him in that position, for a program to be aired on national television. As we have stated, the camerawoman stood at the threshold of the motel bathroom door and filmed Thompson's exposed buttocks as Officer Gard stood over him while Officer Lee walked outside to retrieve rubber gloves. During that time, the camerawoman zoomed in on Thompson's bare buttocks for several seconds.

Where should the media line be drawn? We think the line should be drawn here. Otherwise, the next case might well involve a civilian filming or photographing a strip search incident to arrest where the contraband is found and removed from an anal or vaginal cavity. Where, as here, the search occurs in a private place and the police are in complete control of the circumstances surrounding the search, we can find no justification for law enforcement to allow a civilian to film or photograph the strip search of a suspect naked below the waist. We conclude that, under these circumstances, the strip search was not only unprofessional but was unreasonable under the Fourth Amendment. We will not sanction such conduct, which demeans the suspect, who is presumed innocent until a trier of fact finds otherwise, and degrades the entire legal process.

█ Still, the State asserts that even if the search is unconstitutional, the cocaine recovered from Thompson's buttocks is admissible under the good faith exception to the exclusionary rule enunciated in *Leon,* 468 U.S. at 897, 104 S.Ct. 3405. In support, the State relies on *Hendrixson,* 234 F.3d at 496–97, where the Eleventh Circuit held that despite a Fourth Amendment violation due to the presence of media at the defendant's home during the execution of a search warrant, the evidence the officers recovered at the home was neverthe-

less admissible under *Leon.* But the State ignores a key difference between the search in this case and the searches in *Hendrixson* and *Leon,* namely, that the search of Thompson was incident to his arrest, and not the result of a warrant.

Indeed, the Ninth Circuit rejected a similar attempt by the government to "suggest[ ] that a 'good-faith' exception applies to all illegal searches." *United States v. Whiting,* 781 F.2d 692, 698 (9th Cir.1986). That court observed:

> The *Leon* exception ... is clearly limited to warrants invalidated for lack of probable cause and does not create the broad 'good faith' exception the government suggests. The *Leon* rule should therefore not be applied to invalid warrantless searches.

*Id.* (citations omitted).

Here, again, the officers had not obtained a warrant, but searched Thompson incident to his arrest. Unlike in cases where a warrant has issued, the officers in this case were not relying on a probable cause determination made by a neutral and detached magistrate. To the contrary, the officers were in complete control of the circumstances surrounding the strip search, and they permitted the civilian camerawoman to film Thompson naked below the waist.

We hold that the good faith exception to the exclusionary rule does not apply here. *See id.* Thus, we conclude that the trial court abused its discretion when it admitted the cocaine recovered from Thompson's buttocks into evidence. We reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.

KIRSCH, C.J., and VAIDIK, J., concur.