DECISION AND JUDGMENT ENTRY
This case is before the court on appeal from the Toledo Municipal Court which, following a bench trial, found appellant Opal Covey guilty of fourteen counts of cruelty to animals in violation of R.C. 959.13. For the reasons that follow, the decision of the trial court is affirmed in part and reversed in part.
At all material times appellant owned a business known as Opal's Country Store and Thrift Shop on Fassett Street in the city of Toledo. Following citizen complaints, Toledo Humane Society cruelty investigator Kevin Warner visited appellant's establishment and discovered conditions that concerned him, including kittens with ocular discharge and bird cages with fecal matter and old food on the bottom of them. Warner advised appellant that the birds were not being housed properly. In the following months, from March to August 1997, Warner visited appellant's establishment approximately fifteen times, discovering, on various visits, kittens with ocular and nasal discharge (indicating infection), filthy bird cages, and dogs housed in display-rack-like "cages" that were either too small for the dogs to lay down in or too small for the dogs to lay down in without laying in their own fecal matter. (Warner noted that the style of cages did not allow the fecal matter to drop through the bottom.) He also noticed on his various visits a set of puppies in a Pepsi-Cola display rack with urine soaked paper and fecal matter on the bottom, filthy cat litter boxes, inadequate water for kittens (e.g., one coffee mug of water for four or five cats), one cage with three cats containing no litter box and no food or water, birds with feathers missing, birds with overgrown beaks and missing nails, and bird cages caked with moldy bread, seed, and fecal matter. Warner also noticed improperly housed birds with too little perch space, rodent cages with maggot-and cockroach-infested bedding, filthy fish tanks with green opaque water, and seven or eight dogs attached on a twelve foot chain with two or two and one-half feet of chain for each dog. There were no visible signs of food and water for these dogs.
Warner testified that in the many months that he visited appellant's establishment, he tried to educate her as to the proper way to house and feed animals, even providing her with an animal husbandry manual, but he saw no improvement. Consequently, the Toledo Humane Society obtained a search warrant for the premises and executed the warrant on August 14, 1997. Upon gaining entry, Warner and Tracy Strain, a Toledo Humane Society animal care supervisor, began a two-day process of photographing and taking inventory of all animals seized from the premises. According to Warner, once workers began executing the warrant, they discovered that conditions on the premises were actually worse than they originally thought, with thin, languishing rodents with open sores, puppies with diarrhea and low energy, and dogs housed outside in the back of the premises in a fenced area containing boards with protruding nails. Warner also noted a terrible fly problem, and he learned that the establishment had been without electricity for several days. At that point, Warner decided to seize all of the animals on the premises. The Toledo Humane Society seized a total of four hundred seventy-seven animals and thirty eggs. Once the animals were transported to the Toledo Humane Society, each was examined by a veterinarian and given an intake sheet.
Following the seizure of appellant's animals, appellant was charged with twenty-six counts of cruelty to animals, with different species of animals grouped together for charging purposes. Appellant pleaded not guilty and the case was tried to the bench in Toledo Municipal Court in February 1998.
Warner testified at trial as to his visits to appellant's store before the seizure and as to the conditions he observed during that period. He also testified as to the process the Toledo Humane Society employed for conducting the inventory of the animals and for photographing each one. Finally, he testified as to the condition of the animals upon closer examination of them at the Humane Society, including the discovery of a chain embedded in the neck of a pregnant dog, which served as an explanation to Warner for why the dog seemed unusually still and reluctant to move its head. In the end, according to Warner, approximately thirty-seven of appellant's animals died after they were seized.
Tracy Strain, the Toledo Humane Society animal care supervisor, testified at trial about her observations of appellant's establishment on the day of the raid. She testified that she saw kittens in an overcrowded cage with dirty litter, little or no food, and dirty water. In various places in the store she observed dirty cages and pens with urine in them and feces that looked old. She testified that she saw cats with no food or water and puppies with no water, rodent cages with bug-infested bedding, and dirty bird cages. Strain also testified that she observed poultry in the back of the building in dirty cages with no food or water present.
Upon examination at the Toledo Humane Society, Strain testified that many of the dogs were flea-infested and many had pale gum coloration. Many of the cats were thin and had upper respiratory infections. Some of the cats had diarrhea, a possible sign of feline leukemia or T.I.P, both fatal diseases. Nine of the eighteen cats tested positive for feline leukemia. Dog stool from appellant's dogs tested positive for Parvo virus, an often fatal disease in dogs. Many of the rodents were thin and had overgrown teeth, making it difficult or impossible for them to eat. Strain testified that the birds were thin and showed signs of vitamin deficiency.
Dr. Deborah Kropp, a veterinarian, examined most of the species of animals on the day they were seized. She testified at trial that most of the adult dogs were too thin, that many of them had ear infections, and that many of them had fly strike on the ears, a condition caused when an animal is left outside and flies are allowed to eat the edges of the ears. Dr. Kropp also testified that the dogs had poor coats, which was a result of poor nutrition, and that their coats were dirty. Most of the dogs, according to Dr. Kropp, had fleas and pale mucous membranes. She testified that pale mucous membranes indicates anemia, a condition that could be caused by flea infestation. Dr. Kropp also viewed the picture of the pregnant dog with the collar embedded in its neck and testified that such a thing can happen when a dog wears a collar that does not accommodate the dog's growth; over time, the dog's neck simply grows over the collar. Finally, Dr. Kropp testified that the adult dogs who were chained to the wall were not properly confined.
Dr. Kropp also testified about her examination of the puppies seized from appellant's premises. She testified that, like the adult dogs, the puppies were thin, had pale mucous membranes, and were infested with fleas. The puppies had poor, rough coats which she believed was the result of inadequate nutrition. In her opinion, the puppies were in poor condition.
Dr. Kropp also examined the cats that were seized from appellant's premises. She testified that most of the cats had ocular and nasal discharge, usually indicating an upper respiratory infection, and that they, too, were thin and had pale mucous membranes and flea infestation. Several of the cats had diarrhea, many had severe ear infections, and several had gingival lesions on their gums. Approximately one-half of the cats tested positive for feline leukemia and many tested positive for a lethal illness known as T.I.P She testified that these illnesses can be prevented by testing and vaccination. In her opinion, the cats were in very poor condition.
Dr. Kropp also testified about the condition of appellant's rabbits. She testified that, because the rabbits were not properly maintained, the majority of them had overgrown teeth, which in turn results in the rabbits being physically unable to eat. She also testified that the rabbits were thin and that many had loose stool and matted or missing hair. One rabbit had conjunctivitis, and the same rabbit had ocular and nasal discharge, probably an early sign of a respiratory illness known as snuffles.
Finally, Dr. Kropp testified as to the condition of the gerbils, hamsters, guinea pigs, and domesticated rats (the "pocket pets", as she called them) that were seized from appellant's premises. According to Dr. Kropp, many of the gerbils had dermatitis on their abdomens, probably the result of their moist bedding. All of the hamsters had overgrown incisors, which is a sign of poor care, and which can result in the animals eventually being unable to eat. Many had growths or tumors that had been ulcerated, a sign that they had not been examined or treated. Most of the hamsters and gerbils were too thin. Several of the hamsters and gerbils eventually died after they were seized; in Dr. Kropp's opinion, the animals probably died from lack of nutrition and overgrown teeth (which eventually leads to starvation). Likewise, the rats were too thin as a result of inadequate nutrition. The guinea pigs, like many of the other pocket pets, had overgrown incisors, a sign of poor maintenance, and many had dermatitis from moist bedding. She also testified as to the effect of maggot-and cockroach-infested bedding on these pocket pets. According to Dr. Kropp, the maggots would eat the skin of the pets and as a result the pets would eventually become toxic.
On the day of the raid or in the few days following it, Dr. Susan Elaine Pontius examined the various birds that were seized from appellant's premises, including an Amazon, some cockatiels, parakeets, finches, doves, love birds, and conyers. Testifying first about the cockatiels, Dr. Pontius stated that the birds were obviously overcrowded. Many of the cockatiels were missing several feathers and were either bald or semi-bald from either self-mutilation or from having their feathers picked by other birds. Dr. Pontius explained that when birds pick their own feathers, it is usually due to a physical or psychological problem, and when birds pick the feathers of other birds, it is usually due to overcrowding. She also noted overgrown toenails, a consequence of poor maintenance, some overgrown beak tips, and some changes in the oral cavities of some of the birds that might indicate a vitamin deficiency. She indicated that, overall, some of the birds were underweight, but most were of an adequate weight.
Testifying about the parakeets, Dr. Pontius stated that the parakeets were in the best condition of all of the species of birds because they are generally the hardiest type of bird. As a group, the parakeets appeared healthy, but some had large masses in their abdomens (a condition that parakeets are particularly prone to), and some had splayed legs, a condition of the tendons seen in birds that have poor nutrition or are overbred. Some of the parakeets had signs of feather picking. Similarly, some of the canaries had signs of feather picking around the head, a sign that another bird had caused it. Some of the canaries had over-grown nails, possibly a sign of poor nutrition, and one bird, as Dr. Pontius recalled, had an overgrown beak, an indication of neglect.
Dr. Pontius also testified about her examination of the larger birds. The redhead parrot had signs of vitamin deficiency, and some of the other larger birds showed signs of vitamin deficiency as well. In Dr. Pontius' opinion, the parrots were in moderate to poor health. The love birds showed signs of heavy feather picking, an indication of overcrowding, and they had damage to their toes and missing toenails, which indicates trauma inflicted by another bird. The love birds were all thin. According to Dr. Pontius, the love birds were improperly housed; being aggressive birds, they should not be housed in large groups. Similarly, the doves showed signs of overcrowding, poor housing, and vitamin deficiency. They were dirty and thin and had damaged tail feathers. Most had lice, which according to Dr. Pontius, only occurs in caged birds when they are in a filthy situation. In Dr. Pontius' opinion, the doves were in "pretty bad shape." Likewise, the finches were heavily feather-picked, a sign of overcrowding. Overall, Dr. Pontius believed that the birds were in a "very poor nutritional state."
Three other witnesses testified on behalf of the state. Briefly summarized, Dr. Boudouris, appellant's veterinarian, testified as to the number of times that appellant had visited his office. He opined, in general terms, that he would expect to see in his office more frequently an individual who owned in excess of four hundred animals. James Bancroft, an employee of the Toledo Humane Society who works with birds, testified that he examined appellant's birds after they were seized. His testimony did not differ substantially from Dr. Pontius' testimony. Finally, Stephanie Grove testified that she had been a customer at appellant's store in August 1997 and found that store to be dirty. She testified that the animals did not appear to be healthy and that the dogs chained to the wall did not have food and water. She also testified that she purchased from appellant a three-week old six-ounce kitten that required medical attention and around-the-clock care to nurse it back to health.
Several witnesses testified on behalf of appellant. Bonnie Larkins testified that appellant loved her animals, that she called them her "babies," and that she took good care of them by feeding them, watering them, and cleaning up after them. Evelyn J. Black testified that she observed appellant feeding and watering her animals and that she had taken appellant shopping on occasion for pet food. Black testified that the kittens were well-cared for and were healthy, and she had observed appellant putting eye drops in the cats' eyes. Similarly, Yolanda Riley testified that appellant's animals were healthy and well-cared for and that appellant exercised the dogs regularly. She stated that she had observed appellant cleaning the cages. Walter Chandler, an electrician who had done work at appellant's establishment, testified that he observed appellant care for her animals, referring to them as "her babies." He stated that he had seen appellant feed the animals and talk to and play with them, and he had observed her cleaning the cages. Four of appellant's workers also testified on behalf of appellant. First, Frank Damon testified that he worked for appellant during July and August 1997 and helped her care for the animals, including feeding the animals and cleaning the cages.
He indicated that he had exercised the dogs as well. However, Damon also testified, while looking at pictures of the conditions on the day of the raid, that some of the cages looked as if they had been dirty for three or four days, and he admitted seeing maggots and cockroaches in the small animal bedding "a couple of times" in a "couple of cages." He also testified that he never observed appellant treat her animals for lice or fleas, and he never observed appellant trim the birds beaks or nails. He also admitted that the water in the fish tank was "real dark green."
Second, Bobby McQueen testified that he worked for appellant during the end of July and early August 1997. According to McQueen, he took care of the dogs by cleaning their cages and exercising them twice a day, he fed the cats and cleaned their cages, he fed the birds, and he cleaned the bird cages two or three times a day.
Third, Marsha Gordon testified that she worked for appellant on and off and did so during 1997. She testified that she cleaned up after the dogs and cats and she fed and watered those animals. She also cleaned the hamster, gerbil, and bird cages and fed and watered those animals. According to Gordon, when she cleaned the gerbil tanks, she removed the old bedding and scrubbed the tanks with water. She testified that each type of bird was fed special food for that particular species. She also took care of the ducks. Gordon testified that she washed the animals as well.
Finally, Michele Girard testified that she helped out at appellant's store off and on and helped her with the kittens in the few months before the raid. She testified that she donated six kittens to appellant and believed that the kittens at appellant's store were well-fed and that all of appellant's animals were well-cared for.
Patricia McDonald testified that, as the owner of Oaks Feed Company, she regularly delivered bird food for each particular species of bird, cuttlebone (on which birds sharpen their beaks), grit for the birds' claws, water bottles for the bird cages, and rabbit, hamster, and gerbil food. However, she testified that her last delivery to appellant was in March 1997.
Appellant testified on her own behalf. She denied having extensive conversations about her animals with Warner, and she testified that she only had brief discussions with him about the cats and the dogs. She testified that her animals always had food and water, that she maintained her birds by clipping their nails and beaks when necessary, that her dogs never laid in their own feces, that one of her bald parrots was given to her in that condition, and that the parakeets came to her with splayed (or spraddled) legs. Overall, she testified that she loved her animals and took good care of them.
After trial, the trial judge found appellant guilty on fourteen of the twenty-six charges. Appellant was found not guilty as to the fish, one adult gerbil, the parakeets, the white ducks, the roosters, the mallard ducks, and various other birds. Those charges were dismissed. In addition, the trial judge dismissed charges she deemed to be duplicative of other charges.
On each count for which she was found guilty, appellant was sentenced to ninety days incarceration at CCNO, she was fined $50, and she was ordered to pay court costs. Additionally, the court ordered forfeiture of all animals that were subject to the offenses for which she was found guilty. Appellant's sentence was suspended and she was placed on probation for five years subject to the following conditions: (1) all of appellant's animals in the possession of the Toledo Humane Society subject to the offenses for which she was not found guilty were to be forfeited to the Toledo Humane Society; (2) appellant was not to own, possess, or care for animals during her probationary period; (3) appellant was not to own, operate, or work in a pet store during her probationary period; (4) appellant was to be subject to unannounced monthly visits by either the Toledo Humane Society or appellant's probation officer to determine compliance with the terms of appellant's probation; (5) appellant was to submit to a psychosocial evaluation and comply with treatment recommendations; (6) appellant was to make restitution to the Toledo Humane Society in the amount of $8,359.12 to cover the cost of treatment and specialized equipment incurred by the Toledo Humane Society, not including boarding expenses.
Appellant appeals her conviction, setting forth the following six assignments of error:
"First Assignment of Error
 THE COURT EXCEEDED ITS AUTHORITY IN ORDERING THE FORFEITURE OF ALL ANIMALS SEIZED INCLUDING THOSE AS TO WHICH APPELLANT WAS NOT FOUND TO HAVE VIOLATED THE LAW, AND INSOFAR AS FORFEITURE OF THE ANIMALS MAY HAVE BEEN PROPER AS A TERM OF PROBATION, APPELLANT SHOULD HAVE BEEN INFORMED THAT SHE COULD AVOID THE FORFEITURE BY DECLINING THE PROBATION AND ACCEPTING THE IMPOSED SENTENCE.
"Second Assignment of Error
 OFFICERS EXCEEDED THE SCOPE OF THE SEARCH WARRANT WHEN THEY SEARCHED AREAS OUTSIDE APPELLANT'S SHOP AND SEIZED ANIMALS NOT LOCATED IN THE SHOP, AND ANY EVIDENCE OR CONSEQUENCE AS TO THOSE ANIMALS SHOULD HAVE BEEN SUPPRESSED.
"Third Assignment of Error
 THE TRIAL COURT EXCEEDED ITS AUTHORITY IN ORDERING RESTITUTION PAID TO THE TOLEDO HUMANE SOCIETY FOR `TREATMENT AND NECESSARY EQUIPMENT.'
"Fourth Assignment of Error
 APPELLANT'S RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE I OF THE OHIO CONSTITUTION WERE VIOLATED WHEN MEMBERS OF THE MEDIA AND OTHER NON-LAW ENFORCEMENT OFFICERS WERE BROUGHT ALONG WHEN THE SEARCH WARRANT WAS EXECUTED ON HER PROPERTY.
"Fifth Assignment of Error
 APPELLANT'S CONVICTIONS WERE IMPROPER AS THE MANIFEST WEIGHT OF THE EVIDENCE DID NOT SHOW THAT APPELLANT RECKLESSLY MAINTAINED THE ANIMALS AT ISSUE IN SUCH A WAY AS TO VIOLATE R.C. 959.13(A)(1).
"Sixth Assignment of Error
 INSOFAR AS TRIAL COUNSEL FAILED TO PRESERVE ANY OF THESE ISSUES FOR APPEAL, APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL."
In her first assignment of error, appellant makes a two-fold argument: first, that the trial court should not have ordered forfeiture of the animals subject to the offenses for which she was not found guilty; and, second, that if forfeiture of these animals was proper, appellant should have been informed that she could have avoided forfeiture by declining probation and serving the imposed sentence. As to both of these arguments, it is important to note that appellant did not preserve these alleged errors in the trial court. Therefore, we review this assignment of error for plain error. State v. Barnett (1999), 131 Ohio App.3d 137,142. Plain error is error that is obvious and prejudicial and which, if not corrected, "would materially and adversely affect the character of and the public confidence in judicial proceedings." Id.
Appellant contends in the first part of her first assignment of error that the court exceeded its authority in ordering forfeiture of the animals subject to the charges for which she was not found guilty. We note first that, pursuant to R.C.2951.02(C), a trial judge has broad discretion in setting terms of probation. State v. Jones (1990), 49 Ohio St.3d 51, 52. However, this discretion is not without limits. Id. According to the Supreme Court of Ohio, to determine if conditions of probation are in conformity with the policy and purposes of R.C.2951.02, the court should consider whether the condition:
 "* * * (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation." Id.
This court previously held that the Jones factors are satisfied when a trial court orders as a condition of probation that the defendant forfeit all animals, including those not subject to the charges for which the defendant was found guilty. See State v.Barker (1998), 128 Ohio App.3d 233, 252. On the authority ofBarker, we find no plain error in the trial court ordering that appellant forfeit all of her animals as a condition of probation.[1] See, also, State v. Sheets (1996),112 Ohio App.3d 1, 8-9, discretionary appeal not allowed (1996),77 Ohio St.3d 1485 (trial court did not abuse its discretion in ordering forfeiture of all animals as a condition of probation since such a condition satisfied the Jones
factors.)[2]
In the second part of her first assignment of error, appellant contends that the trial judge should have informed her that she could avoid forfeiture of her animals by declining probation and serving her sentence instead. Appellant goes as far as to argue that, by not informing her that she could decline probation, the trial court denied her of her constitutional rights under the United States and Ohio Constitutions. However, appellant cites no authority for this proposition, and the court's independent research has failed to uncover any Ohio authority supporting appellant's proposition. One appellate court in Ohio has soundly rejected this contention, holding that a defendant has no constitutional right to refuse probation. See State v. Walton
(March 31, 2000), Hamilton App. No. C-990308, unreported. We find the reasoning in Walton persuasive, and we, too, hold that appellant had no constitutional right to refuse probation. Finding no plain error, appellant's first assignment of error is not well-taken.
In her second assignment of error, appellant contends that those executing the search warrant exceeded the scope of the warrant when they searched outside, in the back of the premises, and seized the animals housed there. We review this alleged error under the plain error rule as well since appellant did not preserve this alleged error in the trial court. See Barnett,131 Ohio App.3d at 142. Law enforcement officers may legally seize items not listed on a search warrant under the plain view doctrine where the initial intrusion was legal and where the incriminating nature of the items is immediately apparent. Statev. Waddy (1992), 63 Ohio St.3d 424, 442, certiorari denied (1992), 506 U.S. 921, citing Coolidge v. New Hampshire (1971),403 U.S. 443. The discovery of the items need not be inadvertent.Id. at 442, fn. 5, citing Horton v. California (1990),496 U.S. 128.
In this case, the search warrant provided:
 "Attached hereto is a copy of the Affidavit having been made by KEVIN WARNER that he has reason to believe that on the premises owned by Opal Covey and operated as Opal's Country Store and Thrift Shop known as 320 Fassett St., Lucas county, Ohio, specifically located inside the building situated upon the subject premises, there are now being concealed the following animals: * * *."
Both Strain and Warner testified that they did not initially intend to remove all of the animals on the premises, but once they saw the condition of the animals, they decided that they had to seize all of them. Applying the plain view doctrine to the seizure of the outside animals, first, the area in the back of the store was clearly in plain view: Warner testified that he could see this area from the outside of the store while driving through the back alley. Second, appellant does not contend that the initial intrusion was illegal. Finally, the incriminating nature of the evidence was immediately apparent. Both Warner and Strain testified that dogs were housed in a pen with only a tarp for cover and that the pen contained inside of it loose boards with nails protruding out of it. Tracy Strain testified that there was no apparent food or water in that particular dog pen and that the pen contained "a lot of stool." Also immediately apparent was the unsanitary condition in which the poultry was housed (pens containing fecal matter that the birds would have had to walk over or lie in), and the absence of food and water for the poultry. We therefore hold that the outside animals were properly seized under the plain view doctrine. Finding no plain error, appellant's second assignment of error not well-taken. See, also, State v. Durch (1984), 17 Ohio App.3d 262, 263
(residents do not have a reasonable expectation of privacy in areas that can be viewed from normal routes of ingress and egress into the premises); Sheets, 112 Ohio App.3d at 7 (defendant did not have a reasonable expectation of privacy in a pasture that was not fenced in a way to prevent observation).
In her third assignment of error appellant contends that the trial court exceeded its authority in ordering restitution to the Toledo Humane Society for expenses other than property damage. Since appellant did not preserve this alleged error at trial, we review it for plain error. Barnett, 131 Ohio App.3d at 142. Appellant correctly argues that Ohio law does not permit a court to order a defendant to make restitution for expenses not related to property damage. See, e.g., State v. Orr, (1985), 26 Ohio App.3d 24,26; State v. Hileman (1998), 125 Ohio App.3d 526,528-529, motion for reconsideration granted on other grounds (April 8, 1998), Butler App. No. CA96-10-219, unreported; R.C.2929.21(E). However, R.C. 959.13(C) provides that fines collected for a violation of R.C. 959.13 shall be paid to the local humane society. Therefore, the $700 fine that the court ordered appellant to pay ($50 for each of the fourteen counts for which appellant was found guilty), shall be paid to the Toledo Humane Society. Additionally, the trial court ordered that the Toledo Society be permitted to sell appellant's forfeited animals. According to R.C. 959.99(D), the proceeds from such a sale must first be applied to the expenses incurred in caring for the animals from the time the animals were removed from the custody of their owner. The trial court so ordered in its judgment entry sentencing appellant. Therefore, though the trial court exceeded its authority in ordering appellant to make restitution to the Toledo Humane Society, the Toledo Humane Society may nonetheless recover its expenses in caring for the animals by collection of the fine (R.C. 959.13(C)), and by applying the proceeds from the sale of the animals toward its expenses (R.C. 959.99). We find that the trial court committed plain error in ordering restitution to the Toledo Humane Society, and appellant's third assignment of error is found well-taken.
In her fourth assignment of error, appellant argues that her constitutional rights under the Ohio and United States Constitutions were violated when "members of the media and other non-law enforcement officers were brought along" when the search warrant was executed. Again, since this alleged error was not preserved at trial, we review it for plain error. Barnett,131 Ohio App. 3d at 142. Appellant cites to Wilson v. Layne (1999),119 S.Ct. 1692 for the proposition that "media ride-alongs" during the execution of a warrant violates a defendant'sFourth Amendment rights. In Wilson, the media was actually invited by law enforcement officers to ride-along and be present during the execution of the warrant. The Supreme Court stated, "We hold that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant."Wilson, 119 S.Ct. at 1699. In this case, since there is no indication in the record that the Toledo Humane Society invited the media to accompany it on the raid, we cannot say that the media's presence at the scene violated appellant's constitutional rights. Finding no plain error, the fourth assignment of error is not well-taken.
In her fifth assignment of error, appellant contends that the judgment is against the manifest weight of the evidence. According to the Supreme Court of Ohio, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony." State v.Thompkins (1997), 78 Ohio St.3d 380, 387, motion for reconsideration denied (1997), 79 Ohio St.3d 1451, quoting Tibbsv. Florida (1982), 457 U.S. 31, 42. In this case, the trial court, acting as the fact-finder, found appellant guilty of fourteen counts of R.C. 959.13(A)(1), which provides:
"(A) No person shall:
 (1) Torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good and wholesome food and water[.]"
To be found guilty under this section, the defendant must be found to have acted recklessly. See, e.g., State v. Lapping
(1991), 75 Ohio App.3d 354, 358-59, jurisdictional motion over ruled (1992), 63 Ohio St.3d 1441.
Sitting as a "thirteenth juror" and reviewing the trial court's resolution of the conflicting testimony, we cannot say that the judgment was against the manifest weight of the evidence. The veterinarians testified at trial that the animals showed signs of poor nutrition and/or vitamin deficiency. Strain, Warner, and Grove testified as to the lack of food and/or water for many of the animals at various times. Looking at the evidence as a whole, we hold that the record amply supports the trial judge's decision. Accordingly, the fifth assignment of error is not well-taken.
In her sixth assignment of error, appellant argues that, to the extent that trial counsel did not preserve the foregoing errors at trial, she was denied effective assistance of counsel. The Supreme Court of Ohio has held that courts should apply a two-part test to determine ineffective assistance claims. According to the Supreme Court:
 "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v. Bradley (1989), 42 Ohio St.3d 136, at paragraph two of the syllabus, certiorari denied (1990), 497 U.S. 1011, citing State v. Lytle (1976), 48 Ohio St.2d 391; Strickland v. Washington (1984), 466 U.S. 668.
The court must defer to the strong presumption that counsel's performance falls within the wide range of reasonable professional performance. Bradley, 42 Ohio St.3d at 142. Even if counsel's performance falls outside the objective standard of reasonable representation, the court shall not reverse unless counsel's ineffectiveness resulted in prejudice. Id. In order to show prejudice warranting reversal, the defendant must show that there is a reasonable probability that, but for counsel's ineffectiveness, the outcome of the proceeding would have been different. Id., quoting Strickland, 466 U.S. at 694.
The Court in Bradley derived guidance from the Strickland
decision on how to proceed with the two-part analysis for ineffective assistance claims. In Strickland, the United States Supreme Court stated:
 "Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, quoted in Bradley, 42 Ohio St.3d at 143.
Keeping these principles in mind, we find that appellant's ineffective assistance claim is without merit because she was not prejudiced by trial counsel's failure to preserve the errors she complains of in this appeal. Despite the fact that the alleged errors were not preserved in the trial court, this court considered all of them and found all but one to be without merit. Additionally, appellant has not shown that there is a reasonable probability that trial counsel's failure to preserve these errors at trial affected the outcome of the trial in any way. Accordingly, the appellant's sixth assignment of error is not well-taken.
The decision of the Toledo Municipal Court finding appellant guilty of fourteen counts of cruelty to animals in violation of R.C. 959.13 is affirmed in part and reversed in part. The portion of the judgment ordering restitution to the Toledo Humane Society in the amount of $8,359.12 is reversed and vacated. The judgment is affirmed in all other respects. The court costs of this appeal are to be borne equally by the parties.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 ___________________________ MARK L. PIETRYKOWSKI, J.
 PETER M. HANDWORK, J. JUDGE, JAMES R. SHERCK, J. JUDGE, CONCUR.
[1] Following trial, appellant filed a memorandum arguing against forfeiture of her animals. However, until this appeal, she has never argued that the court was without authority to order forfeiture of all of her animals as a condition of probation. Accordingly, we reviewed this assignment of error for plain error. However, if we deem appellant to have preserved the error complained of in her first assignment of error by filing the memorandum in opposition to forfeiture, we would review this alleged error for abuse of discretion. See, e.g., Barker,128 Ohio App. 3d at 250. Even applying the abuse of discretion standard, we would still conclude that the trial court did not err in ordering forfeiture of all of appellant's animals.
[2] Appellant urges that, in the event we choose to follow our decision in State v. Barker (1998), 128 Ohio App.3d 233, we certify this case as being in conflict with cases from the Eighth and Tenth districts in Independence v. Tector (1996), 116 Ohio App.3d 359
(Eighth district) and Columbus v. Davis (May 30, 1991), Franklin App. No. 90AP-1423, unreported (Tenth district). However, the holdings of those cases are based on an interpretation of Ohio Supreme Court law in State v. Jones
(1990), 49 Ohio St.3d 51 that is different from our interpretation of Jones. Differing interpretations of Supreme Court law is not a proper basis for certification. Whitelock v.Gilbane Bldg. Co. (1993), 66 Ohio St.3d 594, 598-599. Accordingly, we decline to certify this case to the Supreme Court of Ohio.