Becker v. State







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





IVONNE PADILLA,
                      
                                Appellant,

v.

PETER MASON AND JAESON JONES,

                               Appellees.

§
 
§
 
§
 
§
 
§
 
 § 


No. 08-03-00123-CV

Appeal from the

346th District Court
of El Paso County, Texas

(TC# 2001-4336)



 

 

 




O P I N I O N

            This case involves Ivonne Padilla’s claim that two Texas Department of Public Safety
troopers, Peter Mason and Jaeson Jones, used excessive force against her during a traffic stop,
resulting in personal injuries. Padilla brought suit against Mason and Jones asserting both federal
and state law claims. The trial court granted summary judgment in favor of Mason and Jones on
their affirmative defenses of qualified immunity and official immunity. We affirm.
AFFIRMATIVE DEFENSES
            In her first two issues, Padilla contends that Mason and Jones failed to establish that there
is no genuine issue of material fact as to one or more essential elements of the affirmative defenses
of qualified immunity and official immunity.
 

Standard of Review
            The issue on appeal is whether Mason and Jones, as the movants, met their summary
judgment burden by establishing that no genuine issue of material fact exists and that they are
entitled to judgment as a matter of law. See Tex.R.Civ.P. 166a(c); Cate v. Dover Corp., 790 S.W.2d
559, 562 (Tex. 1990); Wallace v. Moberly, 947 S.W.2d 273, 275 (Tex.App.--Fort Worth 1997, no
writ). We will resolve all doubts about the existence of a genuine issue of material fact in favor of
the non-movant, Padilla. Wallace, 947 S.W.2d at 275, citing Cate, 790 S.W.2d at 562. Therefore,
we must view the evidence and its reasonable inferences in the light most favorable to her. Great
American Reserve Insurance Company v. San Antonio Plumbing Supply Company, 391 S.W.2d 41,
47 (Tex. 1965); Wallace, 947 S.W.2d at 275. In deciding whether there is a material fact issue
precluding summary judgment, we will disregard conflicts in the evidence and accept evidence
favorable to Padilla as true. Harwell v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d 170, 173 (Tex.
1995); Wallace, 947 S.W.2d at 275. We will not consider evidence that favors the position of Mason
and Jones unless it is uncontroverted. Great Am., 391 S.W.2d at 47; Wallace, 947 S.W.2d at 275.
Facts
            Padilla is a United States Border Patrol agent. On the evening of November 17, 2000, Padilla
and her fiancé, Rafael Ramirez, who is also a Border Patrol agent, went to a nightclub in El Paso. 
Ramirez drank three beers and Padilla drank two. They left the club and drove to Horizon City to
find a friend, but they were unsuccessful and returned to El Paso. At around 2 a.m., DPS Trooper
Peter Mason pulled the car over for speeding. At Mason’s request, Ramirez exited the vehicle and
stood outside of his car. When Ramirez produced his driver’s license, Mason saw his Border Patrol
badge. Ramirez told Mason that both he and Padilla were Border Patrol agents and that he had been
drinking that evening. Mason noted that the vehicle had no front license plate, and that both the
registration and inspection stickers had expired. Mason noticed that Ramirez appeared tired and
asked whether someone else could drive the car. Ramirez replied that Padilla could drive. When
Mason learned that Padilla had also been drinking that evening, he decided to ascertain whether she
was capable of driving. He did not tell either Ramirez or Padilla that this was his intention.
            Mason approached the passenger side of the vehicle, opened the door, and asked Padilla
whether she could drive the car. Padilla had heard none of the exchange between Mason and
Ramirez, as they had been standing outside of the car and she had remained inside. Mason, who had
seen empty beer bottles in the car when Padilla exited, asked Padilla whether she had been drinking,
and she replied that she had. Mason told her that he wanted to perform a field sobriety test but he
did not explain why. Padilla became upset and argumentative because she did not understand why
he was doing the field sobriety test when she had not been driving the car. Mason explained the
instructions for the horizontal gaze nystagmus test (HGN). He became frustrated with Padilla
because she did not follow his instructions. Rather than following his finger with just her eyes,
Padilla moved her entire head. In an angry, condescending tone, Mason told Padilla not to move her
head, but she still did not follow his instructions. Because of Mason’s demeanor and tone of voice,
Padilla felt fearful and uneasy, and she did not understand why he was treating her that way.
            Due to Padilla’s demeanor, Mason asked whether she had her service weapon with her.


 
When Padilla hesitated, Mason feared for his safety and decided to conduct a pat-down search. 
Mason placed his flashlight on the hood of the car and asked Padilla to turn around toward the
vehicle so that he could perform a pat-down. In his deposition and summary judgment affidavit,
Mason explained that as he reached for Padilla’s left elbow with his left hand in order to guide her
around, she quickly pulled away and brought her arm up toward his neck and head, stating “You will
not arrest me.” Mason quickly turned Padilla around and attempted to secure her arms. He secured
her left arm and placed it in an arm bar but Padilla continued to push back against him in what
appeared to be an attempt to free herself. Mason pulled Padilla’s left wrist and arm behind her back
and pushed her wrist up her back in an effort to stop her from struggling. During the struggle, Mason
heard a “pop,” and he told Jones, who arrived on the scene shortly before the struggle,


 that he
thought he had broken Padilla’s arm. He was quite correct, as Padilla suffered a spiral oblique
fracture of her humerus bone which required surgical repair and insertion of a metal plate.
            Padilla had a different view of the events which led to her injury. Mason did not ask her
about her duty weapon when he asked her to turn around nor did he tell her that he was going to do
a pat-down. When Mason asked Padilla to turn around, she asked him why he was arresting her
because she knew she had not violated the law. Padilla recalled that Mason asked her to turn around
after he was already physically turning her, and “it happened very fast and all of a sudden he’s, like,
on top of me, practically.” Mason grabbed Padilla’s arms and turned her around, and she felt pain
in her left arm when he pulled it behind her back. Although she repeatedly told Mason that he was
hurting her arm, he would not stop. Padilla’s next memory was that she slumped to the ground in
pain, and was pulled to her feet and handcuffed.
            The record includes a videotape of the encounter. Mason and Jones rely heavily on this
videotape to support their contention that Padilla resisted Mason’s attempt to perform a pat-down,
leading to her restraint and injury. Due to officer error, there is no audio during Mason’s approach,
the attempted sobriety test, or the struggle between Mason and Padilla. The video shows Mason and
Padilla facing each other beside the passenger door, with Mason shining his flashlight in Padilla’s
face, presumably in an attempt to perform the HGN test. Padilla can be seen motioning with open
hands just below her waist. Mason reached behind Padilla, slowly set his flashlight on the car, and
attempted to turn her around. As he touched Padilla’s arms, she suddenly jerked away and one of
her arms flailed towards Mason’s upper body and face. Mason grabbed her arms, twisted her around,
and shoved her into the side of the car three times. With each impact, the two moved closer to the
rear of the car, until Padilla slumped to her knees. Her left arm hung limply at her side from this
time forward. The physical confrontation between Padilla and Mason lasted approximately nine
seconds. Jones then appeared in the video and momentarily grasped Padilla by her left arm. The
troopers then handcuff Padilla’s good arm to her jeans and Mason conducted a pat-down search.
            Audio is first heard on the tape after Mason returned to his patrol car. Mason requested that
EMS be dispatched because he thought a “subject’s arm is broken.” Padilla, concerned that she
would get in trouble with her employer, told the troopers that she just wanted to go home. Mason
explained that he only wanted to determine whether she could drive the vehicle and states, “. . . you
started freaking out on me.” Ramirez, who was standing nearby, reiterated, “. . . babe, and you
freaked out.”
            In a separate discussion, Mason told Jones twice that he thought he broke Padilla’s arm and
Jones advised him to not say anything. Jones mentioned that both Ramirez and Padilla had been
stopped before for speeding, and cautioned Mason, “you need to cover yourself.” Jones also advised
Mason that he needed to call a supervisor. But rather than calling a DPS supervisor, Mason called
a Border Patrol supervisor.



            While the troopers waited for the supervisor, EMS arrived and evaluated Padilla. Mason told
the EMS attendant that he placed Padilla under arrest and twisted her arm behind her because she
struggled with him. Padilla immediately disputed Mason’s statement that she had struggled. The
EMS attendant was unsure whether Padilla’s arm was broken or dislocated and recommended that
it be x-rayed. Padilla refused to be transported by EMS to the hospital.
            While EMS attended to Padilla, Mason asked Ramirez whether there were any weapons in
the car. Ramirez replied that there were none and Mason seemed satisfied with Ramirez’s answer. 
When Jones asked Mason what happened, he gave his version of events:
When I told her to put her--hold her hands like this, she goes, you know, you’re
trying to make me look stupid. . . . I said, ma’am, I’m trying to get your head to stop
moving. Every time I say, watch my finger, you move your whole head. . . . She
wouldn’t do it. She just--and then I said, ma’am, turn around. Turn around. So she
started getting loud and boisterous. And I was like, at this point, you know, federal
agent or not, you--fuck that. You know, I don’t know if you’ve got your gun on you
or not, but I said, ma’am, turn around. And when I grabbed her hand--you’re
arresting me? And just started--you know, I’m like, ah shit. And then I grabbed her. 
And then when I grabbed her, wham, pop, and I held her right there.

When the Border Patrol supervisor, Captain Ron LeBlanc, arrived, Mason gave the following
explanation about what had happened:
[Mason]: Pulled them over for speeding.
 
[Captain LeBlanc]: Okay.
 
[Mason]: 70 in a 55. Get them out, talk to them a little bit, find out he’s a little bit
intoxicated.



 
[Captain LeBlanc]: All right.
 
[Mason]: Then I--and so that I don’t have him drive, I want to see if she can drive
the car.
 
[Captain LeBlanc]: Uh-huh.
 
[Mason]: And I go to talk to her, she don’t want to follow any instructions I give her. 
And then when I told her to hold her head straight, she got pissed.
 
[Captain LeBlanc]: Is he armed? Is he carrying a gun?
 
[Mason]: No, neither one of them are armed.
 
[Captain LeBlanc]: Did you pat them down?
 
[Mason]: No, I didn’t pat them down.


 

. . .
 
[Captain LeBlanc]: Are both of them agents?
 
[Mason]: Yes. 
 
[Captain LeBlanc]: They’re both agents?
 
[Mason]: Yep. She tended to get--she just went ballistic and started getting upset
and loud. And I said, Ma’am, if you don’t calm down, you know, I’m going to have
to place you in handcuffs. She didn’t want to do it, so I end up--said, Okay. So I
grabbed her by her hand. As I turned her around, she said, You ain’t--you ain’t
arresting me. And she turned around and started trying to fight, and then that’s when
I threw her over the car, and I think that I may have--I don’t know--broke her arm or
popped it out of socket or something, but we called EMS. They were already out
here. They checked her for her arm, put her in a sling. She refused to go with them-- 
 
[Captain LeBlanc]: Okay. 

            Mason and Jones released Ramirez and Padilla to Captain LeBlanc and left the scene. Mason
notified his supervisor about the incident after returning to the DPS office with the videotape,
approximately thirty minutes after he left the scene. Mason intended to file resisting arrest and
public intoxication charges against Padilla, but his superiors decided not to file any charges against
Ramirez or Padilla and ordered Mason not to do so.
Qualified Immunity--Federal Claims
            Padilla sued Mason and Jones in their individual capacities for excessive force and false
arrest pursuant to 42 U.S.C. §1983. She alleged that they used unreasonable force in violation of her
right to be free from unreasonable seizures under the Fourth Amendment and that they subjected her
to an unreasonable restraint of her person without due process in violation of her rights under the
Fifth Amendment. In response to these federal claims, Mason and Jones moved for summary
judgment on the ground of qualified immunity.
            Qualified immunity is an immunity from suit available to government officials sued in their
individual capacities under section 1983. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 
2738, 73 L.Ed.2d 396 (1982); Scott v. Britton, 16 S.W.3d 173, 180 (Tex.App.--Houston [1st Dist.]
2000, no pet.). Government officials performing discretionary functions have qualified immunity
from a suit for damages so long as the official’s conduct does not violate clearly established
constitutional or statutory rights of which a reasonable person would have been aware. See Wilson
v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999); Harlow, 457 U.S. at
818, 102 S.Ct. at 2738. Qualified immunity protects all but the plainly incompetent or those who
knowing violate the law. Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271
(1986). Whether an official can be held personally liable for taking an allegedly unlawful action
turns on the “objective legal reasonableness” of the action, assessed in light of the legal rules that
were “clearly established” at the time the action was taken. Anderson v. Creighton, 483 U.S. 635,
639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Qualified immunity shields an officer if a
reasonable officer could have believed the action to be lawful in light of clearly established law and
the information the officer possessed. Hunter v. Bryant, 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116
L.Ed.2d 589 (1991); Anderson, 483 U.S. at 641, 107 S.Ct. at 3040.
            In conducting a qualified immunity analysis, we engage in a two-part test: (1) whether the
plaintiff has alleged a violation of a clearly established constitutional right; and (2) whether the
official’s conduct was objectively reasonable at the time of the incident. See Saucier v. Katz, 533
U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); Wilson, 526 U.S. at 609, 119 S.Ct.
at 1697. The threshold question is whether the facts alleged, taken in the light most favorable to the
party asserting the injury, show that the officer’s conduct violated a constitutional right. Saucier,
533 U.S. at 201, 121 S.Ct. at 2156. If the facts do not show a constitutional violation, the official
is entitled to immunity. Id. If, on the other hand, violation of a constitutional right is shown by the
facts alleged, the next step is to determine whether that right was clearly established at the time of
the alleged violation. Id.
            In her amended petition, Padilla alleged that Mason, without provocation, shoved her into
the side of the vehicle, twisted her arm behind her and continued to apply force while knowing that
he had injured her arm.


 With respect to Jones, she alleged only that he kept her handcuffed during
the duration of the traffic stop. Padilla alleged that the force used by Mason and Jones was
unreasonable under the circumstances and violated her Fourth Amendment right to be free from of
an unreasonable seizure.


 The use of force violates the Fourth Amendment if it is excessive under
objective standards of reasonableness. Saucier, 533 U.S. at 201-02, 121 S.Ct. at 2156; see Graham,
490 U.S. at 395, 109 S.Ct. at 1871. But the analysis does not end there, because we must still
consider whether the right allegedly violated was clearly established in a more particularized sense. 
See Saucier, 533 U.S. at 202, 121 S.Ct. at 2156; see Anderson, 483 U.S. at 639-40, 107 S.Ct. at
3039. The contours of the right must be sufficiently clear that a reasonable official would understand
that what he is doing violates that right. Saucier, 533 U.S. at 202, 121 S.Ct. at 2156. The relevant,
dispositive inquiry in determining whether a right is clearly established is whether it would be clear
to a reasonable officer that his conduct was unlawful in the situation he confronted. Id. Placing the
issue in the context of this case, the relevant inquiry is whether it would be clear to a reasonable
officer that it was unlawful to use force against Padilla under the circumstances.
            Three legal concepts come into play in this case: probable cause, temporary detention based
on reasonable suspicion, and pat-down search. An officer has probable cause to make an arrest when
the facts and circumstances within the officer’s knowledge, and of which he has reasonable
trustworthy information, are sufficient to warrant a person of reasonable caution to believe that a
particular person has committed or is committing an offense. Gerstein v. Pugh, 420 U.S. 103, 111,
95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975); Amores v. State, 816 S.W.2d 407, 413 (Tex.Crim.App.
1991). An officer is generally justified in briefly detaining an individual on less than probable cause
for the purposes of investigating possibly-criminal behavior where the officer can “point to specific
and articulable facts which, taken together with rational inferences from those facts, reasonably
warrant [the] intrusion.” Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). 
Further, a state official who detains a person briefly for investigation may conduct a limited
pat-down search of that person if the official has a reasonable belief that the person detained poses
a threat to the official’s safety or the safety of others. See Terry, 392 U.S. at 27, 88 S.Ct. at 1883. 
The same standards will apply whether the person detained is a pedestrian or is the occupant of an
automobile. See Shaffer v. State, 562 S.W.2d 853, 855 (Tex.Crim.App. 1978). We also must bear
in mind that the right to make an arrest or investigatory stop “necessarily carries with it the right to
use some degree of physical coercion or threat thereof to effect it.” Graham, 490 U.S. at 396, 109
S.Ct. at 1872. During a temporary detention, officers may use such force as is reasonably necessary
to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. Rhodes
v. State, 945 S.W.2d 115, 117 (Tex.Crim.App. 1997).
            The uncontroverted summary judgment evidence established that probable cause existed to
stop Ramirez for speeding. During the course of his brief investigation, Mason learned that Ramirez,
who appeared noticeably tired, had been drinking. Ramirez also told Mason that Padilla had been
drinking. Although Ramirez did not exhibit any signs of intoxication, he admitted to Mason that he
was tired. At this point, Mason became concerned about Ramirez’s ability to safely operate the
vehicle and he decided to ascertain whether Padilla was capable of driving. When Padilla exited the
vehicle, Mason saw empty beer bottles in the passenger side floorboard and Padilla had the odor of
alcohol on her breath and exhibited other signs of intoxication. Padilla did not follow Mason’s
instructions for the field sobriety test and became increasingly upset and argumentative. According
to Jones, Padilla was yelling at Mason in an aggressive manner when Jones arrived on the scene. 
At this point, a reasonable peace officer had reasonable suspicion to investigate whether Padilla had
committed public intoxication.



            The evidence is conflicting whether Mason then asked Padilla if she had her weapon with
her. But given Padilla’s aggressive demeanor and the possibility that she had her weapon with her,
a reasonable peace officer could have concluded that conducting a Terry pat-down search for
weapons was both necessary and appropriate. A reasonable officer could have also believed that the
circumstances permitted the handcuffing of Padilla during the remainder of the investigative
detention in order to maintain the status quo and ensure his safety. When Mason touched Padilla’s
elbow in an effort to turn or guide her around to face the vehicle, she pulled her arm away, nearly
striking Mason in the upper body, and stated, “You will not arrest me.” At that point, a reasonable
law enforcement officer would have believed that he had probable cause to arrest Padilla for resisting
arrest


 and was authorized to use force to secure the arrest.



            Jones did not appear on the video until after the injury had occurred. While he initially
grasped Padilla by the injured arm to lift her from her knees into a standing position, he let go after
a couple of seconds and did not touch the arm again. There was no evidence that Jones knew
Padilla’s arm was broken at the time he attempted to lift her to a standing position. In fact, the
summary judgment evidence established that Jones did not know until later that Padilla’s arm had
been injured. Under these facts, a reasonable officer could have believed that it was appropriate to
lift Padilla to her feet. The summary judgment evidence also established that Jones maintained the
handcuff on Padilla’s uninjured arm for the duration of the roadside detention. A reasonable peace
officer could have believed that it was proper to handcuff Padilla either because probable cause
existed to arrest her for resisting arrest or to ensure the officer’s safety and maintain the status quo
during the remainder of the detention.
            Because there was no clearly established rule which would prohibit Mason from using the
force that he did, he is entitled to qualified immunity. Likewise, there was no clearly established rule
that would prohibit Jones from briefly grasping Padilla’s injured arm before he knew it was injured
or from maintaining a handcuff on Padilla’s uninjured arm during the continuing investigation. The
trial court did not err in granting summary judgment in favor of both troopers on the ground of
qualified immunity. Issue One is overruled.
Official Immunity--State Claims
            Padilla sued Mason and Jones for false arrest, defamation, intentional infliction of emotional
distress, and assault and battery. The troopers asserted official immunity as an affirmative defense
to these state law claims.
            Official immunity is an affirmative defense that shields governmental employees from
personal liability so that they are encouraged to vigorously perform their official duties. Telthorster
v. Tennell, 92 S.W.3d 457, 460-61 (Tex. 2002). It is designed to protect public officials from being
forced to defend their decisions that were reasonable when made, but upon which hindsight has cast
a negative light. Id. at 463. Official immunity is particularly appropriate and necessary in police
work, where officers must be free to make split-second judgments based on their experience and
training, without fear of personal liability. Id. A governmental employee is entitled to official
immunity for (1) the performance of discretionary duties (2) that are within the scope of the
employee’s authority, (3) provided that the employee acts in good faith. Id. at 461. To obtain
summary judgment on the basis of official immunity, a governmental employee must conclusively
establish each of these elements. Id.
            In Telthorster, the Texas Supreme Court enunciated the good-faith standard to be applied
when a police officer is sued for injuries inflicted during an arrest. Id. at 459. Noting that its
approach to good faith has been shaped by “a desire to avoid overdeterrence of energetic law
enforcement,” the court considered the balance to be struck between the competing interests of
unflinching law enforcement and the right of citizens to recover for injuries caused by unreasonable
conduct. Id. at 463-64. The court found that the inherent risks to the general public previously
considered in cases involving high-speed chases are not implicated in cases involving injuries during
an arrest. Id. at 464. Official immunity’s underlying purpose to encourage energetic law
enforcement is most salient in the context of street-level police work, which frequently requires
quick and decisive action in the face of volatile and changing circumstances. Id. During arrest
situations, officers routinely are forced to make split-second judgments in circumstances that are
tense, uncertain, and rapidly evolving. Id. Arresting officers often confront at close range suspects
whose violent intentions and capabilities may not be readily apparent. Id. A high risk of liability
would likely compel arresting officers to act hesitantly when immediate action is required, subjecting
themselves and the public to unnecessary risks. Id. Based on these policy considerations, the court
held that when an officer is engaged in an arrest that results in injury to the suspect, a particularized
need/risk assessment is not compelled in light of official immunity’s overriding purpose to reduce
the threat that civil liability may deter arresting officers from acting with the decisiveness and
judgment required by the public good. Id.
            In cases such as this one, the officer asserting official immunity must still prove good faith
but without the need/risk assessment designed to protect the general public. Id. at 465; City of
Lancaster v. Chambers, 883 S.W.3d 650, 656-57 (Tex. 1994). The court formulated the following
good faith test: the defendant must show that a reasonably prudent officer, under the same or similar
circumstances, could have believed that his or her conduct was justified based on the information
he possessed when the conduct occurred. Telthorster, 92 S.W.3d at 465. The defendant need not
prove that it would have been unreasonable not to engage in the conduct, or that all reasonably
prudent officers would have engaged in the same conduct. Id. Rather, he must prove only that a
reasonably prudent officer, under similar circumstances, might have reached the same decision. Id. 
That the defendant was negligent will not defeat good faith; this test does not inquire into “what a
reasonable person would have done,” but into what a “reasonable officer could have believed.” Id.
            Once the officer meets that burden, the plaintiff must do more than show that a reasonably
prudent officer could have reached a different decision. Id. Instead, the plaintiff must offer evidence
that no reasonable officer in that position could have believed that the facts justified the conduct. 
Id. If officers of reasonable competence could disagree on this issue, the officer acted in good faith
as a matter of law. Id.
            Padilla does not dispute that Mason and Jones were performing discretionary duties within
the scope of each trooper’s employment. Therefore, the only issue is whether the troopers
conclusively established the good faith element.
Trooper Mason’s Good Faith Evidence
            Mason’s summary judgment evidence included the affidavit of Albert Rodriguez,
Commander of the Training Academy for the Texas Department of Public Safety. Rodriguez
reviewed the videotape, in slow motion and frame-by-frame; Padilla’s original complaint; the oral
depositions of Padilla, Ramirez, Mason, Jones, and Thomas Mandarino (Mason’s supervisor); and
DPS Internal Affair’s investigation of the incident. Rodriguez concluded:
(1) the initial stop for speeding was based on probable cause; 
(2) Mason acted reasonably in asking whether the passenger could drive given Ramirez’s statements
that he had been drinking and was tired; 

(3) any reasonable law enforcement officer could have believed that Padilla might also be too tired
to drive or intoxicated; 

(4) reasonable suspicion existed to investigate whether Padilla was intoxicated; 

(5) given that Padilla exhibited signs of intoxication, she became agitated and uncooperative, and
Mason knew Padilla was a Border Patrol agent, any reasonable law enforcement officer could have
believed that Padilla was armed with an off-duty weapon;

(6) under these circumstances, any reasonable law enforcement officer could have believed that it
was necessary to conduct a “pat-down” search to ensure the officer’s safety;

(7) the frame-by-frame view of the incident shows that Padilla physically resisted Mason’s attempt
to turn her around;

(8) probable cause existed to arrest Padilla for resisting the pat-down search pursuant to Section
38.03 of the Penal Code; 

(9) Mason brought Padilla’s left arm behind her back, a technique known as “joint manipulation,”
to gain control of Padilla and handcuff her;

(10) the joint manipulation technique is a type of “weaponless control” and is the lowest level of
physical force as outlined in TCLEOSE’s use of force continuum;

(11) Mason’s use of force was justified, necessary, and legal under Section 9.51 of the Penal Code; 

(12) any reasonable and prudent law enforcement officer could have taken the same or similar
actions when presented with the same or similar circumstances; and

(13) Mason’s actions were objectively reasonable, discretionary, within the course and scope of his
authority and conducted in good faith.

            The summary judgment evidence, including Rodriguez’s affidavit, conclusively demonstrates
that a reasonably prudent officer could have believed that it was necessary to conduct a pat-down
search, and a reasonably prudent officer might have decided to use force to gain physical control of
Padilla and handcuff her after she resisted the officer’s attempt to search her.
Trooper Jones’ Good Faith Evidence
            Padilla did not assert in her petition that Jones used force against her. Instead, she
complained that he maintained a handcuff on her uninjured arm during the remainder of the
detention. Rodriguez concluded that there was no objective evidence to indicate that Jones used
force or falsely arrested Padilla. Given that probable cause existed to arrest Padilla for resisting
arrest and she continued to struggle against Jones even while handcuffed, a reasonably prudent
officer could have believed that maintaining physical custody of Padilla was appropriate.
Padilla’s Evidence
            In response, Padilla offered an expert witness affidavit by Harry Kirk, who holds an
instructor’s license from TCLEOSE and has twenty-seven years of law enforcement experience. 
Based on his review of the videotape, Kirk concluded that Padilla did not pose a threat to the safety
of the officers to justify their use of a degree of force sufficient to cause a broken arm or to
exacerbate her injury. The affidavit additionally stated that “no objectively reasonable officer under
the same or similar circumstances would have continuously applied the level of force as was used
against Ivonne Padilla under the circumstances depicted. . . .” But the affidavit fails to satisfy
Telthorster because it does not establish that no reasonable officer could have believed, under the
circumstances, that Padilla posed a potential threat, that it was necessary to conduct a pat-down
search, and that Padilla’s resistance to the search justified the use of force. It does not establish that
the circumstances were such that no reasonable officer could have believed that the defendants’
conduct was justified. At best, Kirk’s affidavit shows only that reasonably competent officers could
disagree as to whether the use of force was objectively reasonable.
            The facts here demonstrate the tension between protecting the rights of a citizen and
protecting public officials from private liability for zealously performing their official duties. We
are troubled by the missing audio, by Jones’ warnings that Mason “cover himself,” and by Mason’s
inconsistent stories. We have noticed the not-so-veiled reference to turf struggles between various
law enforcement agencies and Mason’s decision to summon Padilla’s supervisor rather than his own. 
And we are frankly appalled at Padilla’s uncontroverted testimony that one of the troopers told her
that she “deserved” the broken arm. That being said, we must conclude that Padilla’s summary
judgment evidence falls short of Telthorster’s requirements. For the foregoing reasons, Issue Two
is overruled.


 We affirm the judgment of the trial court.
 
                                                                        ANN CRAWFORD McCLURE, Justice
July 28, 2005

Before Panel No. 4
Barajas, C.J., Larsen, and McClure, JJ.
Larsen, J., not participating