MEMORANDUM OF DECISION
GUERNSEY, C.J.
Following an extensive history of pretrial motions,[1] the trial of this matter pro *218 duced a number of contradictory versions of the events of June 19, 2009 in which the Plaintiff suffered an injury to his knee during the course of (or immediately following) his arrest for behavior that can only be described as drunken and obnoxious. With respect to the question of liability, at issue were whether the arresting officer, Todd Maikshilo, was justified in using a control technique described as a modification of the “rear sentry take-down,” and if so, whether the force used in so doing was excessive. That the Plaintiffs behavior provided probable cause for his arrest for breach of the peace is not questioned by anyone, including the Plaintiff (at least at the time of trial, although certainly not at the time of his arrest).
I
A
FACTUAL BACKGROUND OF THE ARREST
On June 19, 2009, when the Plaintiff was 20 years old, he and a 49 year old friend, Merrick Bolcum, embarked on a journey from Warwick, Rhode Island to the Mohegan Sun for the purpose of attending an Eric Church performance in the Wolf Den. D’Ambra lived with his parents in Warwick and worked in the family construction business as an equipment manager, as well as attending flight school. Upon arrival at one of the parking garages, D’Ambra and Bolcum prepared for the concert by consuming three large[2] rum and cokes each, using a bottle of rum supplied by Bolcum.
Thus fortified, the two proceeded to the Wolf Den only to discover that it was filled to capacity, with places reserved for Players Club members. According to D’Am-bra, they attempted to view the concert by means of an entrance on the right side, were discovered and told to leave, and did so. Feeling the effects of alcohol, they proceeded to a buffet, where they ate and D’Ambra used the men’s room to vomit. He testified that upon returning from the men’s room he observed two security personnel speaking with Bolcum. They were taken by security to Krispy Kreme[3] for coffee and donuts, and it was there that they first encountered Maikshilo, who performed a Breathalyzer test on Bolcum. This account is corroborated by the report of Security Supervisor Matthew Corey and the testimony of Maikshilo, which described how the two were escorted to the Summer Entrance to await the arrival of a Tribal Police officer, who performed the Breathalyzer test, the results of which were either “borderline”[4] or a failure,[5] and resulted in an agreement that the two of them would wait two hours before driving. Neither D’Ambra nor Maikshilo testified as to any animosity between them at this first meeting, and Maikshilo returned to his post at the Sky Casino.
Thereafter, the recollection of the various witnesses of the events leading up to D’Ambra’s arrest and injury diverge on numerous details. Security Officer Edward Martin testified that he first observed D’Ambra at Krispy Kreme from his position at the Summer valet entrance to the Casino, and described D’Ambra’s behavior as “very boisterous, loud,”[6] At *219 some point thereafter D’Ambra announced he was going to get sick and needed fresh ah, so Martin walked him outside the Summer valet entrance. According to Martin, neither Maikshilo nor any other Tribal Police officer was present at this time. Martin’s testimony described increasingly belligerent demeanor on the part of D’Ambra,[7] escalating to the point that Martin called the dispatcher for a Tribal Police officer. Thereafter, Maikshi-lo arrived, followed a few minutes later by Officer Mark Laflamme.
D’Ambra’s version of his second encounter with Maikshilo describes meeting the officer on his way out of the Summer valet-entrance and walking around him, ignoring first the officer’s request to escort him to the men’s room to be sick, and then once outside, the officer’s request that he sit down. Although somewhat minimized by D’Ambra, it is clear that his behavior went downhill soon afterwards.[8] As for the injury to his knee, D’Ambra’s description is as follows:
And then I turned around and I put my hands on my knees and kind of leaned over like I was going to throw up and then out of nowhere I got whacked behind the knee and I hit the ground and as soon as I hit the ground I threw my hands behind my back as fast as I could because I did not want to get hurt. I was scared. I was in a lot of pain. I was screaming. And then that’s when I got loud after I was on the ground and handcuffed.
Transcript at 36. According to D’Ambra, he fell forward with his face landing in the mulch,[9] after which he was handcuffed by Maikshilo.[10] D’Ambra’s recollection was that neither Security nor Laflamme was present.[11]
As to the beginning of Maikshilo’s second encounter with D’Ambra, his testimony corresponds with that of Martin. Approximately 15 minutes after the first encounter, Maikshilo was dispatched back to the Summer valet entrance to deal with an out of control patron. Upon arrival he spoke with Martin, who stated he was having an issue with D’Ambra, described by Martin as using a lot of profanity and alleging that it was the Wolf Den that got him drunk. Martin and Maikshilo’s testimony differ as to whether the Plaintiff was seated at this time, with Maikshilo recalling that he was. At some point D’Ambra rose, directing profanity at Maikshilo and Martin, and challenged the officers to taser him. He then put both hands behind his back, daring the officers to arrest him. With Laflamme assisting, taking D’Am- *220 bra’s left arm, Maikshilo handcuffed him, arresting him for breach of peace.
It was at this point, after Laflamme had walked away to speak with Martin, that Maikshilo asserts D’Ambra attempted to lunge or pull away from him, causing Maikshilo to perform a control maneuver on the Plaintiff to prevent him from falling or escaping.[12] There was much dispute at trial over the maneuver’s nomenclature, but Maikshilo’s description of it as a modified rear sentry takedown is as good as any. With one hand on Plaintiffs shoulder and the other on the handcuffs, Maikshilo applied his right foot to the rear of Plaintiffs left calf, bringing him down on to Maikshilo’s extended right leg.[13] Maikshilo conducted a memorable in-court demonstration of the effectiveness of this maneuver on Plaintiffs counsel. His skill in performing it was impressive.
Laflamme’s account largely tracks that of his fellow officer, recalling that D’Am-bra was sitting on the ground when he arrived, yelling and screaming. At some point D’Ambra rose, approached the officers, and dared them to arrest him, turning around and putting his hands behind his back. During this time, D’Ambra was not physically resisting, but was very loud.[14] Laflamme assisted Maikshilo in handcuffing D’Ambra, and then turned to speak with a security officer about what was going on. When Laflamme turned back towards D’Ambra, he saw him sliding down on to Maikshilo’s leg. Laflamme assisted Maikshilo in getting D’Ambra to the ground. He did not observe D’Ambra trying to escape or the first part of the control maneuver when contact was made with the back of D’Ambra’s knee.[15]
Curiously, there was no video surveillance of this incident. This would not be surprising if D’Ambra’s account is correct, in that he recounts landing in the “mulch” (actually a flower bed), an area off to the right (facing the entrance) that quite likely was not covered by the security cameras. Maikshilo and Laflamme’s testimony, however, places the incident more directly in front of the Summer valet entrance which, if correct, makes the lack of video surveillance puzzling.[16]
Thereafter, Connecticut State Police took custody of D’Ambra, transporting him in a wheelchair to their office for processing. The State Police criminal information, Defendant’s Exhibit C, contains inaccurate hearsay statements relative to D’Ambra’s behavior prior to arrest. However, statements made to the state trooper concerning D’Ambra’s allegation that he had been drinking at the Wolf Den are consistent with other reports of him making the same allegation, particularly that of Security Supervisor Corey in speaking with D’Ambra during the initial encounter at the Season’s Buffet,[17] as well as his *221 statement at the emergency room of Backus Hospital, to which he was taken by Mohegan Ambulance following release from State Police custody.
B
MEDICAL EVIDENCE RELEVANT TO USE OF FORCE
X-rays taken at Backus Hospital that night revealed a tibial spine avulsion fracture. A cruciate ligament injury was noted to be a possibility. D’Ambra was given pain medication and directed to follow up with an orthopedist. On June 21, 2009 he presented to Kent Hospital, where x-rays confirmed the “there may be an avulsion fracture of the intercondylar eminence of the proximal end of the tibia” as well as effusion within the knee joint. On June 24, 2009 he was seen by Dr. Brian J. Jolley at the Lahey Clinic in Lexington, Massachusetts, reported the history of the events at Mohegan Sun on June 19, 2009, and assessed his current pain level at 8-9/10. Dr. Jolley’s examination revealed “rather impressive” ecchymosis, and his assessment was “blunt trauma to the knee with huge effusion.” Plaintiffs Exhibit 5. D’Ambra declined an aspiration at that time and he was sent for an MRI to assess intra-articular damage to the knee. This was performed the next day and revealed a large lipohemarthrosis, a loose body, a medial patellar facet bone bruise and a high-grade partial tear of the medial reti-naculum and lateral subluxation of his patella. Arthroscopic surgery, at least to remove the loose body and possibly to repair it, was recommended by Dr. Jolley. At that time aspiration was performed, removing 120 mL of bloody fluid.
Surgery was performed on July 10, 2009, with pre- and post-operative diagnoses of: 1. Left knee loose body; and 2. Posttraumatic arthropathy. The procedures, consisting of left knee arthroscopy, removal of loose body, and synovectomy, were performed under general anesthesia. A photograph of the loose piece, which appears to be almost two inches in length, is included in Plaintiffs Exhibit 5. During post-operative physical therapy he was given a corticosteroid injection due to large effusions. Physical therapy resulted in significant but slow improvement.
Relevant to the amount of force applied to D’Ambra’s left knee by Maikshilo during the modified rear sentry takedown on June 19, 2009, is Dr. Jolly’s description of D’Ambra’s injuries:
He was seen in follow-up on June 30, 2009. His pain was still severe and motion very limited. The MRI revealed a large amount of fluid, a lipohemarthro-sis. This is a mix of blood and fat consistent with a fracture. There was a fracture of the anterolateral femur and a large loose body, from the fracture site. He also had a high grade sprain of his medial retinaculum (tissue holding his patella in place) and lateral subluxation of his patella. These findings are consistent with a traumatic dislocation/sub-luxation of his patella remlting in a fracture and loose body. He also had significant bone bruising seen indicative of severe trauma....
Plaintiffs Exhibit P-7 (emphasis added). In assessing whether excessive force was employed by Maikshilo in the performance of the modified rear sentry takedown, the Court has the benefit of the testimony of Reginald Allard, the Defendant’s expert, who taught methods of restraint and control, including the rear sentry takedown, for 23 years at the Connecticut State Police Academy. When asked by the Court, *222 over Defendant’s objection,[18] as to whether he had “any statistics with respect to the frequency of knee injuries resulting from training cadets in the execution of the rear sentry takedown,” Allard testified as follows:
This specific technique, I have never had an application of a rear sentry take down in that static environment of a gymnasium, 13,000 people in which an injury was sustained by a recruit based on the application of the strike. Never. We’ve had injuries, inclusive of myself, with other techniques and misdirected, unintentional strikes to the front of the kneecap as well as the meniscus on the outside of the knee. But not with this particular technique. Hundreds, thousands of times that I’ve applied it, had it applied to me, to the recruits, we’ve never had an injury based on the strike itself causing injury to a recruit.
II
ANALYSIS
While the testimony as to the events surrounding the arrest and injury of D’Ambra differ in significant detail, there are at least two points upon which the Court finds virtually no dispute. First, that D’Ambra was drunk, hostile, and, without any justification, extremely rude and abusive towards Mohegan Security and Police personnel who were treating him professionally and with respect.[19] Secondly, despite this, and even recognizing that a drunk person can suddenly become violent, D’Ambra did not become so, even according to the testimony of Maiksh-ilo that D’Ambra lurched forward making Maikshilo concerned for D’Ambra’s safety, not his own. As Laflamme testified, there was never any doubt that the officers could control D’Ambra.
The issue of qualified immunity, raised by the Defendant, turns on the “objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.” Pearson v. Callahan, 555 U.S. 223, 244, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), quoting Wilson v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). In the instant case, placing D’Am-bra under arrest for breach of peace was clearly objectively reasonable, as was handcuffing him, although both the point at which and manner in which he was handcuffed is disputed.
*223 Connecticut has long held that “the force to be used by an officer in making an arrest must not be necessary, but reasonably necessary under the circumstances.” Lentine v, McAvoy, 105 Conn. 528, 532, 136 A. 76 (1927); see also Martyn v. Donlin, 151 Conn. 402, 411, 198 A.2d 700 (1964) (“[u]nder our rule, in effecting a legal arrest, the arresting officer may, with the exception hereinafter noted,[20] use such force as he reasonably believes to be necessary, under all the circumstances surrounding its use, to accomplish that purpose, that is, to effect the arrest and prevent an escape.”). The use of force so excessive as not to be objectively reasonable constitutes a breach of a legal duty to the arrested person, and falls within the definition of “tort” set forth MTC § 3-245 that forms the basis for the limited waiver of sovereign immunity in MTC § 3-250(b).
It should be noted that Defendant’s arguments under Conn. Gen.Stat. § 52-557n are inapplicable. This case is governed by the Mohegan Torts Code and the waiver of immunity contained therein, MTC § 3-250(b). The waiver set forth in Conn. Gen.Stat. § 52-557n, and the bewildering and inconsistent caselaw that has flowed therefrom, simply have no applicability to the sovereignty of the Mohegan Tribe. Tribal sovereign immunity is not a matter of state law, and the extent to which the Connecticut legislature (or the Connecticut Supreme Court) may or may not have waived the governmental immunity of municipalities is irrelevant. As the MacLean court held in a case interpreting a possible waiver of immunity inferred from the Uniform Administrative Procedures Act:
Even if the Uniform Administrative Procedure Act had been held by the Connecticut Supreme Court in some way to constitute a waiver of sovereign immunity, the more fundamental issue presented is whether a decision by the Connecticut Supreme Court finding a waiver of the sovereign immunity of the State of Connecticut becomes the substantive law of the Mohegan Tribe by virtue of MTO 95-4 Section 301 and Article XIII, Section I of the Constitution of the Mohegan Tribe of Indians of Connecticut. We hold that the applicable tribal law of the Mohegan Tribe recognizes and preserves the sovereign immunity of the Tribe, and that a waiver of sovereign immunity by the State of Connecticut may not be incorporated into the substantive law of The Mohegan Tribe pursuant to MTO 95-4 Section 300 et seq.
MacLean v. Office of the Director of Regulation, 1 G.D.A.P. 20, 22, 5 Am. Tribal Law 273 (2004) footnotes omitted).
As to the amount of force used to subdue D’Ambra, the issue of whether the use of the modified rear sentry takedown was excessive in and of itself may be a close call, but the appropriateness of the degree of force that was used in doing so is not. “All claims that law enforcement officers have used excessive force-deadly or not— in the course of an arrest, investigatory stop, or other ‘seizure’ of a free citizen should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard-”. Weyel v. Catania, 52 Conn. App. 292, 296, 728 A.2d 512 (1999). quoting Graham v, Connor, 490 U.S. 386, 395 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).
The proper application of the Fourth Amendment’s reasonableness test requires careful attention to the facts and circumstances of each case, including the following:
1. the severity of the crime at issue;
*224 2. whether the suspect poses an immediate threat to the safety of the officer or others; and
3. whether the suspect is actively resisting arrest or attempting to evade arrest by flight.
Id. at 296-97. Here, the crime at issue was a drunk and disorderly 20 year old clearly committing a breach of the peace, but not threatening anyone. Although Maikshilo was appropriately careful to prevent D’Ambra from gaming access to any of his weapons or equipment, there is no suggestion that D’Ambra attempted to do so, and by Maikshilo’s account D’Ambra was already handcuffed when the maneuver was performed on him. That Maikshi-lo would want D’Ambra seated after being handcuffed was also within his discretion, as was the supposition that D’Ambra would continue to refuse to comply. The Court finds that Maikshilo’s decision to perform the modified rear sentry take-down satisfies the standard of objective reasonableness,
However, Maikshilo was skilled at performing the rear sentry takedown with a minimum of force, as he demonstrated in Court. The force applied to the back of D’Ambra’s knee, sufficient to break off a two inch piece of bone within the knee resulting from a traumatic dislocation/sub-luxation of his patella, was far beyond what was objectively reasonable under the circumstances faced by Maikshilo and constituted a tort within the limited waiver of sovereign immunity in the Mohegan Torts Code. MTC § 3-250(b).[21]
III
DAMAGES
As described by Dr. Jolley, D’Ambra suffered persistent severe pain and swelling. His [initial] “exam was very limited by pain, but he had significant loss of motion and huge swelling of his knee and leg.” Plaintiffs Exhibit P-7. An MRI revealed a lipohemarthrosis (a mix of blood and fat consistent with fracture) and a fracture of the anterolateral femur and a large loose body from the fracture site, as well as a “high grade sprain of his medial retinaculum” and a lateral subluxation of his patella. Dr. Jolley also found significant bone bruising, indicative of severe trauma.
Surgery was performed on July 10, 2009, and the surgical findings including a large osteochondral loose body, which was removed, and “a huge amount of synovitis” (inflammation of the synovial membrane). It was noted that the retinaculum was healing and did not need repair. Although range of motion was improved it was still short of normal. Persistent knee swelling after the surgery was initially treated with diclofenac, but still required aspiration of 80 cc of fluid and corticosteroid injection on August 4, 2009. He underwent physical therapy at Lepre Physical Therapy from 7/27/2009-10/15/2009 (24 sessions) and at Prehab Sports Medicine Services, Inc. from 2/8/2010-3/15/2010 (9 sessions), for a total of 33 sessions. D’Ambra testified that he still does his home exercise program 2 to 3 times per week. When reevaluated by Dr. Jolley on November 28, 2012, his physical examination revealed *225 some persistent loss of motion, and it was noted that he required ibuprofen intermittently for his symptoms. Pursuant to the AMA Guides to the Evaluation of Permanent Impairment, 6th Ed., Dr. Jolley assigned a 7% disability of the left lower extremity (Class I patellar subluxation or dislocation with mild symptoms). This corresponds to a 3% whole person impairment. Plaintiffs life expectancy is 52.5 years.
Economic Loss due to medical and health care expense totals $24,468.76. Inasmuch as it appears that this sum is derived from the gross billings from providers, Plaintiffs copays would be already included, and are irrelevant except in the context of collateral source reduction. Plaintiff testified that he was out of work from the date of injury for a total of 18 weeks, missing approximately 25 hours per week at $17.50 per hour, for a total of $7,875.00 in lost wages, which the Court finds consistent with the medical evidence. Lost time for subsequent physical therapy (while he was able to work) is insufficiently (or not at all) documented and will not be considered. The total actual damages/economic loss under MTC § 3-246 is therefore $32,343.76. Although his hoped-for career as a commercial pilot may have been delayed, there is no evidence of any economic loss associated with this.
In terms of non-economic damages, D’Ambra suffered a severe and painful injury to his knee, requiring surgical correction for the purpose of, inter alia, removing the large bone fragment that Maikshilo’s kick had dislodged from D’Am-bra’s tibia. Fortunately, after 33 physical therapy sessions, he appears to have made a good recovery, with a mild disability rating. Non-economic damages are assessed at $60,000.00
Judgment shall enter for the Plaintiff against the Defendant in the amount of $32,343.76 actual damages and $60,000,00 non-economic damages, for a total award of $92,343.76. The issue of collateral sources will be addressed as provided in MRCP § 47(c).

. Originally filed in the Mohegan Tribal Court against the Mohegan Tribal Police Department and the two individual Tribal police officers, this matter was transferred to the Gaming Disputes Court pursuant to MRCP § 38C. The record shows that the Defendant has filed one motion to strike and two motions for summary judgment, as a result of which was that the Mohegan Tribe was determined to be the proper defendant under MTC § 3-131, and the naming of the Tribal Police Department a case of misnomer.

. Testimony established that the drinks were consumed from Dunkin Donuts travel mugs.

. Krispy Kreme is located at the Summer Entrance.

. Testimony of Todd Maikshilo, Transcript at 146.

. Defendant’s Exhibit D-A.

. Transcript at 11. According to Martin, D’Ambra kept calling out to girls walking by, making comments such as "Nice ass. Why don't you come over and sit with me and stuff like that.” Transcript at 12. Although Initial *219 ly compliant with requests from Martin to calm down, D’Ambra’s behavior became “a little more and more rude.” Transcript at 13.

. "He started getting angered. He wanted to go back into the casino. But he kept saying he was sick. He was going to throw up. He just kept going forward more and more closer to me and calling me an asshole. You can’t do anything. You can’t stop me ...” Transcript at 15.

. D’Ambra testified: ”... And he said you need to sit down. And I said I’m not sitting down, I don't feel good. And he said if you don’t sit down and obey me you’re going to get arrested. And excuse my language and that’s when I kind of flipped the switch. I said you're going to fucking arrest me because I won’t sit down. You're going to arrest me? And he said keep it up, you want to get tasered? And I said fucking taser me. I’ve been tasered before....” Transcript at 36.

. Transcript at 39. This area is visible in Defendant's Exhibit L.

. Transcript at 40.

. Transcript at 40-42.

. Transcript at 165.

. The modification to the maneuver shown in the video (Exhibit P-19) consisted of stopping at this point, rather than throwing the arrestee face first over on to the ground for handcuffing, obviously unnecessary in that D'Ambra was already handcuffed.

. Transcript at 15.

. Transcript at 10,

. Defendant's Exhibit B, the incident report prepared by Maikshilo, reports that "Monitor Room personnel checked for video footage of this incident and stated that they were unable to obtain any due to the area of location of the accused’s arrest."

.Defendant's Exhibit A, Corey’s report, describes the following:
While speaking to Mr, D’Ambra, he admitted to being underage and extremely intoxicated. Mr. D'Ambra stated he had been drinking in the Wolf Den while attending the Eric Church concert and had not been carded.
*221 At trial Mr, D'Ambra denied making these statements.

. The full colloquy was as follows:
THE COURT: I'm going to ask you one other question and I want you to hold your answer to see whether there’s any objection. You were asked about injuries in the course of training cadets who perform this maneuver, do you have any statistics with respect to the frequency of knee injuries resulting from training cadets in the execution of the rear sentry take down?
ATTY. RHODES: Your Honor,
THE COURT: This may be beyond what was discussed at his deposition, I don't know.
ATTY. RHODES: Right. Your Honor, what I would just say in terms of my objection would be that his testimony was about injuries in general during training, not—I don’t think the question or answer was limited to injuries sustained in training of this technique.
THE COURT: I thought it was about this technique. I misunderstood it.
ATTY. RHODES: I didn’t think—I thought it was a broader question Your Honor.
THE COURT: I don't know why we would be asking about other techniques.
ATTY. RHODES: I think the idea was that even practicing any kind of restraint and control techniques in a controlled environment people can still get hurt I think that was the idea of the question.

. The Court is impressed with the professionalism and courtesy shown D'Ambra and Bolcum throughout the evening, commencing with the first encounter at the buffet.

. The exception related to the use of deadly force, not here applicable.

. Defendant’s contention that, given D’Am-bra’s starring role in bringing about his own arrest, the proximate cause of his injuries was his own conduct, would eliminate in every case any claim for excessive force, no matter how unnecessary, except perhaps where the arrest was not based on probable cause. In this case, however, the proximate cause of D’Ambra’s injury' was the extreme amount of force employed by Maikshilo in executing the modified rear sentry takedown. As Laflamme testified, there was never any doubt about the officers’ ability to control D’Ambra.